BLUMENTHAL et al. v. NUSSBAUM et al.
(No. 7273.)

(Court of Civil Appeals of Texas. Galveston. Jan. 30, 1917. Rehearing Denied March 29, 1917.)

1. TRESPASS TO TRY TITLE ⬤⇒32—PLEADING—EQUITABLE TITLE.

In trespass to try title, it is not necessary for plaintiff, who relies on an equitable title, to plead specifically the facts on which his title is based; customary allegations in suits of trespass to try title being sufficient to authorize proof of any fact tending to establish title.

[Ed. Note.—For other cases, see Trespass to Try Title, Cent. Dig. §§ 39–41.]

2. TRUSTS ⬤⇒86—RESULTING TRUST—BURDEN OF PROOF.

In suit to establish a resulting trust, the burden of proof to establish that any trust funds were used in paying for the land is on plaintiff, pleading equitable title.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 128.]

3. TRUSTS ⬤⇒89(5)—RESULTING TRUSTS—DEGREE OF PROOF.

Proof, to establish a resulting trust in land, must be clear and satisfactory, and with a reasonable degree of certainty must trace the trust funds into the payment for the land.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 137.]

4. APPEAL AND ERROR ⬤⇒1001(1)—REVIEW—EVIDENCE.

The rule that new trial will not be granted, or judgment reversed and cause remanded, where there is a scintilla of evidence to support verdict, does not prevail in Texas.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3928–3933.]

5. TRUSTS ⬤⇒89(5) — RESULTING TRUSTS — PROOF.

In suit to establish a resulting trust in land, plaintiffs must disclose all the facts and circumstances connected with the transaction in question, so as to make it manifest that the remedy they ask is just and equitable. It must be made to appear that it is inequitable to withhold the relief they seek; for, if the equities are nearly balanced, the legal title will not be disturbed.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 137.]

6. TRUSTS ⬤⇒89(2)—RESULTING TRUST—SUFFICIENCY OF EVIDENCE.

In suit to establish a resulting trust, evidence *held* insufficient to show that a one-half undivided part of the land belonged to the plaintiffs by reason of their father's using, in the purchase of the land, funds belonging to the community estate of himself and his first wife, plaintiffs' mother.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 135.]

---

⬤⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**7. TRUSTS** &#x2014;87—RESULTING TRUST—SUIT TO ESTABLISH—EVIDENCE.

In suit to establish a resulting trust in land, where plaintiffs base their right to recover on the ground that their father, after his second marriage, invested in the land funds belonging to the community estate of himself and his first wife, plaintiffs' mother, and that he had the land deeded to his second wife, the father's voluntary petition in bankruptcy, filed before his second marriage, a certified copy of the decree adjudging him a bankrupt before such date, and a certified copy of his discharge in bankruptcy were admissible, as tending to show that previous to his second marriage the father had no assets belonging to the community estate of himself and first wife.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 129.]

**8. ADVERSE POSSESSION** &#x2014;114(1)—EVIDENCE.

Evidence of adverse possession by the father *held* not undisputed, so as to require judgment against plaintiffs.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 682, 683.]

Appeal from District Court, Harris County; Chas. E. Ashe, Judge.

Suit by S. J. Nussbaum and another against Joe Blumenthal and others. From a judgment for plaintiffs, defendants appeal. Reversed and remanded.

Wagner & Wagner and Otto Taub, all of Houston, and James B. Stubbs, of Galveston, for appellants. Carothers & Brown, of Houston, for appellees.

LANE, J. This suit was originally brought by S. J. Nussbaum and Meyer P. Nussbaum against P. S. Nussbaum, Joe Blumenthal, Bertha A. Blumenthal, Henry Nussbaum and wife, Sarah, and Mollie Saper and husband, S. Saper, for a one-half undivided interest in lots 4 and 5, in block 126, situated on the south side of Buffalo Bayou, in the city of Houston, and for a partition of the same between those owning an interest therein. They allege, however, that P. S. Nussbaum owns a one-third life estate in said lots, and pray that said partition be made subject to such life estate.

Defendants answered by general demurrer and general denial, and by special averments say that said property was the separate estate of Mrs. Augusta C. Nussbaum at the time of her death; that by her will, which was duly probated on or about the 23d day of December, 1902, Mrs. Augusta C. Nussbaum bequeathed all of said property to the defendants Bertha Blumenthal, Henry Nussbaum, and Mollie Saper, and that by virtue of said will and its probate said defendants own a fee-simple title to all of said property, subject only to a lien thereon created by said will to secure the payment of $250 and $150 bequeathed by said will to M. P. Nussbaum and S. J. Nussbaum, respectively, to be paid upon the death of defendant P. S. Nussbaum. They further say that, if plaintiffs ever owned any interest in said land, they are now barred by the statutes of limitation of three, five, and ten years; that they knew of the existence and provisions of said will of Mrs. Augusta C. Nussbaum at or about the time of its probate, and knew that defendants were claiming and holding said property adversely to them; and that plaintiffs are therefore now barred from recovery herein under the statutes of limitation pleaded by defendants. They pray that the cloud cast upon their title to said lots be removed by a decree of the court.

By supplemental petition plaintiffs alleged that at the time of filing their suit and for a long time prior thereto they had been and are still the owners in fee simple of an undivided one-half interest in said property, and renew their prayer set out in their original and amended petitions, and for judgment against all the defendants for title and possession of their said one-half interest in said property, for writ of possession, etc.

For the purpose of more clearly presenting the nature of the case and the contention of the parties, we deem it appropriate in the outset to make the following statement:

P. S. Nussbaum, one of the defendants herein, was married to his first wife, Ernestine, in 1860. During this marriage he was engaged in the mercantile business in the city of Houston with his brother, I. Nussbaum, under the firm name of S. Nussbaum & Bro. This firm had in Houston a fairly good stock of merchandise, the value of which is not even approximately shown by the evidence. In 1867 the yellow fever was epidemic in Houston, and said firm removed a portion of their stock of merchandise to Huntsville; the value of same being in no way shown. In the fall of 1867 Ernestine Nussbaum died of yellow fever at Huntsville, and left, surviving her, her husband, P. S. Nussbaum, and her two sons, M. P. and S. J. Nussbaum, plaintiffs herein. About the 1st of March, 1868, the firm of Nussbaum & Bro. dissolved partnership; P. S. Nussbaum taking as his part of the assets the stock of goods in Huntsville. After the death of his wife, Ernestine, P. S. Nussbaum sold about $500 or $600 out of his said stock of goods in the regular course of business and used the proceeds thereof for the support of himself and two sons. Some time in 1868, P. S. Nussbaum, being in debt, removed what remained of his stock at Huntsville to Navasota, together with other goods purchased by him on credit in the name of one Hirshberg. With the stock last mentioned a business was carried on in Navasota for eight or ten months under the name of A. Hirshberg. In the spring of 1869 the stock of goods at Navasota was removed to Calvert, and there the business continued under the name of Hirshberg. The stock of goods in Calvert burned some time in 1870; date not shown by any evidence. Thereafter $2,250 insurance was collected on said burned stock and was reinvest-

ed in another stock, and the business was resumed and conducted as before the fire. P. S. Nussbaum testified that shortly after he had purchased his new stock and began business he had another fire, which destroyed his entire stock, except about $25 worth of goods, which he sold, and as he had no insurance on this last stock and no money he did not resume the mercantile business in Calvert. This testimony stands in the record undisputed.

Defendant P. S. Nussbaum married Augusta, his second wife, on the 22d day of February, 1870. On the 24th day of May, 1871, he purchased the lots in question for a recited consideration of $1,500 cash, and the same were conveyed to Mrs. Augusta C. Nussbaum, his second wife. In September, 1902, P. S. Nussbaum executed a deed by which he conveyed all interest he had in said lots to his wife, Augusta, for a recited consideration of $10 and in view of the fact that the purchase money therefor was paid with her separate funds. In the latter part of 1871, or early part of 1872, he and his family moved upon said lots and made the same their homestead, and have at all times since lived upon the same as such homestead. Mrs. Augusta C. Nussbaum died on the 11th day of December, 1902, and left a will, which was duly probated in 1903, by which she bequeathed the lots in question to her children, Mollie Saper, Bertha Nussbaum, and Henry Nussbaum, defendants herein, subject to certain legacies named in said will.

Mrs. Rebecca Nussbaum, wife of I. Nussbaum, former partner of P. S. Nussbaum, with reference to the value of the stock of merchandise owned by P. S. Nussbaum in Huntsville in 1867, testified that she could not say exactly what the value of such goods were when they were taken to Huntsville by P. S. Nussbaum & Bro., but that she knew it was a pretty good stock, because they ran a large stock in Houston; that the stock taken to Huntsville was enough to start a good-sized store there. She further testified that their business was pretty good in Huntsville. She also testified that P. S. Nussbaum was not conducting a store in Calvert in his own name, because he was adjudged a bankrupt, but the business was conducted under the name of Hirshberg, but belonged to Nussbaum; that the stock of goods he had in Calvert was the same he moved from Navasota; that Nussbaum left Calvert in 1871.

J. H. Drennan testified that P. S. Nussbaum began business in Calvert in the summer or fall of 1869; that he carried a stock of about the value of $4,000 or $5,000; that during the time Nussbaum was in Calvert, from 1869 to 1871, he would judge his stock was about the same in value.

Plaintiff S. J. Nussbaum testified that he was born in 1866; that, while he lived with his father and his second wife, Augusta, his father, P. S. Nussbaum, told him in the presence of Mrs. Augusta Nussbaum that he and his brother, M. P. Nussbaum, had a one-half interest in the lots in question from their deceased mother; that Mrs. Augusta Nussbaum made no denial of this statement; that his father made another statement in the year 1892 in the presence of Mrs. Augusta Nussbaum, and told him at that time that he and his brother would get their share of the place.

M. P. Nussbaum, the other plaintiff, testified that he heard his father, P. S. Nussbaum, tell Mrs. Augusta Nussbaum, when he was nine years of age, that he and his brother, S. J. Nussbaum, had a one-half interest in the lots in question, and later he heard his father again tell Mrs. Augusta Nussbaum that he and his brother owned a one-half interest in said lots. He further testified that he had several conversations with Mrs. Augusta Nussbaum when he was about eighteen years of age about his interest in said lots, and that she stated to him that she was satisfied that he and his brother owned one-half interest in said lots.

Defendant P. S. Nussbaum testified by deposition, among other things, as follows:

"I bought the property that is in question in this case in 1871. I am now shown the deed from John McGill and Mary McGill to A. C. Nussbaum, dated May 24, 1871, conveying lots 4 and 5, in block 126, of the city of Houston, Tex., on the corner of Walker and Crawford streets (which is the property in question). A. C. Nussbaum was my second wife. I married her on Washington's Birthday, February 22, 1870, in Calvert. I made the trade myself with McGill for the property in question. At the date of the deed, May 24, 1871, I was living in Calvert. I bought this property in Houston because we wanted to move back; we did not want to live in Calvert.˙ The money with which I bought the property in question came from the money I made in cotton. I sent 100 bales of cotton to Galveston to Focke, Wilkens & Lange, and then sent 38 bales of cotton to some parties in Houston. I brought cotton to Houston to Monheim Jacobs. When I came from Calvert, in order to buy the home (the property in question), I brought some samples of cotton with me, 10 or 12, and Monheim Jacobs bought from me about 8 or 9 bales; I do not remember exactly. I paid 5 cents for cotton and got about 8 or 9 cents for it. Cotton buying and merchandising was where I made the money at Calvert. I moved to Calvert in 1869, I believe. I went from Huntsville to Navasota 12 months after my wife died—not just after she died. I did not have any stock of goods; only the Huntsville goods. I took what stock I had to Navasota. I bought this cotton after I got into business. I bought it with money I made from the business. I did not buy 100 bales at one time. I bought a bale to-day. If I sold a little goods, I bought a bale, 2 bales, or 5 bales. Of course I mean to say that I bought that cotton right out of my business. None of these brokers or cotton factors from Galveston advanced me anything at all. I bought everything out of my business. I shipped to Focke, Wilkens & Lange at one time as much as 100 bales of cotton. I bought it for 5 cents, sometimes: very cheap. I do not know how much I sold it for; I believe it brought me 12½ cents. I cannot tell exactly when it was that I sold that cotton; it was in 1870 or 1871; I think it was in 1871. When I bought that cotton, I kept it until I shipped it, until I had 100 bales. I did not go out on the street and buy cotton.

They came around. When a man brought in, say 2 bales or 4 bales of cotton, the warehouse gave him the samples, and he took the samples and came to the stores. You know cotton was very cheap. Now, a man had 2 bales of cotton, and he wanted 5 or 5½ cents a pound. If I bought it, I gave him the money, and then they bought goods. Sometimes they bought more goods than the cotton came to. We buy cotton that way. We give them goods for it; that is, we give him the money. That was understood right then and there—that I take your cotton and give you a quarter of a cent more, but you have got to take goods."

Called as a witness at the trial of this cause, the same witness testified as follows:

"My brother went back to Huntsville as soon as yellow fever was over. I could not get away. I stayed there a whole year, until the fall of 1868. I had two children, and I had no money to get away, and no goods of any consequence to get away and go to another place. My oldest child died of yellow fever; she died first, and my wife died of yellow fever the week afterwards. The other members of my family were Meyer and Jim. During the time I stayed in Huntsville, after I. Nussbaum left, I had a little goods there, and was taking care of my children, and paid their board and my board. I could not do anything there, because I did not have any money, and no goods to do enough. There was a man owed me money came there, and I wanted him to give me $25 or $50, and he did not do it. At that time I owed money in New York, and I owed money in Houston for the doctors and the expenses that I had to go to. I paid all that I owed in Houston, and I paid the board for my children. We had expenses, of course, during the yellow fever period. My wife was buried in Huntsville in the Masonic burying ground, and I could not bring her to Houston in the fall, and I waited until about March, when the frost killed the germs, and I sent a wagon, and they brought my wife's body and my girl's body here, and buried them in Beth-Israel cemetery. At the time my wife Ernestine died, I did not have a dollar in money. I had goods. We had the store closed there for two or three months, because during the yellow fever we had to close, because there was not a soul coming into town. Instead of opening the store and getting a little money, we could not do it, because nobody came in. I think I had about $500 worth of goods; I never took stock—$500 or $600. At that time I owed more than $20,000. After my wife's death I stayed in Huntsville and tried to get in enough money. I sold all the goods I could sell. For six or eight months nobody came in the town, and I sold to the penitentiary guards, and I took from the superintendent yarn that came in five-pound package, and I brought that down here to Houston, and sold it to Mr. Hutchins, of McIlhaney & Hutchins, and I bought a little supplies. I kept a few yards of calico, and so on, and that is the way I made a living for myself and my children. I forgot to state that after my wife's death, about a week, I took the yellow fever, and had two nurses there that came from Galveston. They heard my family were sick and dying, and two young men that knew me came to nurse me. I was sick, and they all thought I was going to die, and I got over it, and then, of course, I could not get away. After you have yellow fever, for two or three months, especially in the fall or winter, you could not move anywhere. My financial condition at that time was that I did not have a dollar.

"I left Huntsville in the fall of 1868. I went by stage from Huntsville to Navasota. I will say, first, I went to Houston to see if I could get a little goods to open something in Navasota, so as to make a living for me and my children. I do not know what became of the

goods that I left in Houston with E. Raphael; I never got any of said goods. I made arrangements for goods when I came to Houston. All I had was my name, but I was owing in New York a good pile of money, and they were willing to sell me goods, but not under my name, because the creditors would come and take it. So Monheim Jacobs, who kept a wholesale dry goods house, says to me: 'I have got a cousin in here by the name of Hirshberg. I will sell the goods under his name, and you can stay with them and get your share of the profit out to keep up yourself and your children.' At the time I made that arrangement with Monheim Jacobs, I did not have any money or property at all to pay Mr. Jacobs. That was in 1868. I had known Monheim Jacobs before I went to see him; I knew him for years. I moved to Navasota and opened a store there under the name of Hirshberg, of course. I continued to do business in Navasota only a few months, until Calvert was opened. I did not do business in my own name in Navasota. The goods were sold under the name of Hirshberg; they were sold to Hirshberg. I remained in Navasota until the spring of 1869; then I went to Calvert. I went to Navasota in October, I believe, and stayed there until the spring, until Calvert was opened. By 'Calvert was opened' I mean that the Central Railroad just then had a terminus there. I moved to Calvert immediately, as soon as I made arrangements. What little goods I had I was owing for to Monheim Jacobs and McIlhaney & Hutchins, and I had to go there and let them know I was going to Calvert, and when I made arrangements to go to a place like that I had to make arrangements for some more goods, and, of course, I made arrangements, and came back, and went to Calvert. * * * I married the second time on February 22, 1870, after I moved to Calvert. At the time I made arrangements with Monheim Jacobs for the securing of the goods, the arrangement was that they would not give me any goods, with the exception that I would take Mr. Hirshberg, a cousin, and they would sell him the goods, and I should be with them, and attend to them, and get parts of the profits for the support of myself and the children, and upon those conditions they sold me the goods. They would have sold them to me in my name at that time, but they were afraid the creditors would come and take them from me. I had no interest in the goods at that time, except just to get profit enough to support myself and children.

"After my marriage to Augusta C. Nussbaum, February 22, 1870, I continued to live in Calvert until 1871. I continued to operate with Hirshberg. As to the character of the business I was doing after my marriage to Augusta C. Nussbaum—Hirshberg and I were selling dry goods and clothing; a little dry goods store. I was not engaged in any other line. I did not buy or sell cotton while I was with Hirshberg. Hirshberg and I bought cotton just like any other merchant at that time. If a man should come in, and had a bale of cotton, we bought it, and then he bought goods. We did that so that we could do business, like every other store did there; all of them did the same thing. Before I came to Houston I bought cotton. Of course, I made money at that time, Most of the money I made was after my second marriage. At the time when cotton was very cheap was after my second marriage. I brought to Houston samples of cotton and sold it to Monheim Jacobs, 8 or 10 bales. That was in 1871. I shipped other cotton to Focke, Wilkens & Lange about that time. I shipped Focke, Wilkens & Lange all together 135 or 130 bales, I think; I do not remember. I made money off of that. I paid 5 and 6 cents for the cotton; some fine cotton I got at about 5 cents; at that time cotton was very cheap. I did not hold the cotton for awhile. I sent

word that Focke, Wilkens & Lange should hold it, and I gave them a margin, and they sold it almost as soon as they got it. I gave them a margin of 12½ cents for good ordinary. After they sold the cotton, they remitted me for it, and I got that money. The property was acquired in Houston at the time when I made the money. I came to Houston and bought the property in question for my wife with that money, my part of it. That property was located on Crawford, corner of Walker street. I made the money that I used to buy the property in controversy in this suit about the first part of 1871—in 1870 and 1871. I personally handled the deal in the purchase of the property. I took the title to the property in the name of my wife, Mrs. A. C. Nussbaum; that was my second wife. My financial condition before 1870 was that I did not have anything before 1870. Of course, I made money after 1870. I did not move to Houston until the fall of 1871. * * *

"M. P. Nussbaum and S. J. Nussbaum are sons of my first marriage. They lived with me all the time until they got married. They got married and left my house several years before my second wife died. I never at any time had any conversation with them in the presence of my wife, or with them in the presence of any other person, relative to any ownership by them in the property; never a solitary word in the world. I heard them testify in this case. I will tell you, before God, there is not a word of truth in their statements. I am an old man, been living here since 1864, and not a man can say Nussbaum has told a lie—white, black, or any of them. After I acquired the property in question, I executed a deed to it to my wife. I did not consult any one about that, but my wife did. I was present when she consulted about it. I was present, I think, when she made her will, and I think I was present when that deed was signed, of course. I never wrote one thing to Meyer Nussbaum, or S. J. Nussbaum, stating anything about the property, or their ownership of the property; not one word. They never made any claim to me for an interest in said property until the time the suit was filed. I did not know it until I saw it in the paper, and I was thunderstruck."

On cross-examination he testified:

"I lived on the property and occupied it as a home up to the time of my wife's death. I ran away to Huntsville in 1867. After I went to Huntsville, from 1867 to the fall of 1868, the business in Huntsville was running itself. There were about six months I did not take in a nickel, hardly; I had yellow fever for three months. I do not know what six months those were that I ran it and did not take in a cent. There was no business at all. I cannot remember if there was anything sold for six months. I had to have enough to pay for my board for myself and children. I do not know whether it was exactly six months, or four months. I do not know how much I sold during the year I was in Huntsville. As to whether I sold as much as $250 worth of goods in the whole year, how could I have paid for the children's board and my own board if I did not; I did not have any money to pay it. I did not keep any book account of what I sold. I suppose I sold as much as $400 worth; I don't know. I probably sold as much as $500 worth, of course, the whole year. What is the use of asking me if I sold as much as $600 worth? I have not got any book, and did not keep any book, and it has been so long I cannot tell. I did not buy any goods in Huntsville, except just to exchange goods for some yarn I took from the penitentiary. Most that I sold was to the guards of the penitentiary. I did buy goods, but I got it that way. I got several bales of this yarn, and brought it in, and sold it to McIlhaney & Hutchins, and got some goods for

it. I had to keep my store going while I was there, to get something to eat for me and my children. It has been so long ago that I could not tell the maximum amount of goods that I sold while I was in Houston; I know I did enough just merely to keep us alive, to pay the board for the children and myself. I do not know whether I did that out of the profits or out of the sale; I cannot remember. It is in my deposition, isn't it? I cannot remember what I did testify; I can remember some things I testified, of course. I did not take any inventory after I went to Huntsville. I do not know whether or not I got any of this stock of goods that was left in Houston after that. I do not believe I ever got any of it, but it is so long I cannot remember it. The statement is in my deposition that I do not think I did get any of the Houston stock, but I do not know whether I did. I do not remember what I said in my deposition; I am too old to remember. I came down to Houston to see Monheim Jacobs before I had gotten to Navasota. If it is put down in the deposition that I went to see Monheim Jacobs after I had moved to Navasota, it is wrong, because I went before. I could not go to Navasota, if I did not get some goods. Probably I said in the deposition that after I went to Navasota I spoke to Monheim Jacobs, but if I did it was the wrong way, because I remember that when I went to Navasota I had to go first to see Monheim Jacobs, because how could I move on nothing at all? I had two children to take care of."

Plaintiff offered in evidence in this connection the following question and answer from the deposition of the witness P. S. Nussbaum, part of which has been heretofore introduced by plaintiff:

"Q. After you went to Navasota you mentioned that you spoke to Monheim Jacobs?" Answer: "Yes, sir."

Witness then further testified as follows:

"Maybe I did go afterwards. I cannot remember dates; that is impossible to remember for so long a time; I know I had to go and get goods somewheres; whether I went before or after I cannot remember. When I left Houston I was owing them $20,000, I suppose; I cannot remember how much I owed; it was a good sum. I did not pay any of that. When I went to Navasota, Hirshberg bought the goods. I opened up in Hirshberg's name, of course. Hirshberg was there all the time; he ran the business just as much as I did. I was there, and got part of the profits. I don't know whether I had any stock of goods from Huntsville to Navasota. Whatever I had left, of course, I took it to Navasota—whatever I had left in Huntsville. As to whether I opened up that stock in Hirshberg's name—I sold it to him; I don't know. I cannot remember now what Hirshberg paid me for it. As to my knowing that I sold it to him, would you keep anything like that in your head for 50 years? The goods that I had left, if I had any left, I took to Navasota; but whether I had any left or not I cannot remember. Mr. Hirshberg opened them up. He got a lot of goods from Galveston, New Orleans, Houston, and he opened them up. As to how much I had in my store at Navasota—I bought from Monheim Jacobs about $800 or $900 worth of goods, and I bought from McIlhaney & Hutchins about $1,100 or $1,200 worth of goods; I cannot remember exactly how much. I do not know anything about Greaser's Row. I kept up my stock there in Navasota, and then later on I moved that stock to Calvert. I moved Hirshberg along with me to Calvert, and I conducted the business in Hirshberg's name while I was in Calvert. I suppose I carried about $3,000 or $4,000 worth of stock in this business after I got to Calvert. Hirshberg bought it in Houston.

I bought that stock of goods from Monheim Jacobs and McIlhaney & Hutchins; I did not buy it; Hirshberg bought it. I bought part of them, of course; I was the manager of them. Of course, I had to do my work. I do not know whether I got the profits, or what. They would not give me the goods under my name; they would not give them to me unless I ran under somebody else's name; that is the way they generally do. Does counsel suppose I could go and do nothing for me and my children and starve? If you are a lawyer, you ought to be acquainted with such things as that. What could I do with two children, if I did not have somebody else's name to make a living by? I am telling the truth; I was getting goods on account of Hirshberg, to use his name, so that they could not be taken away from us.

"I cannot tell how long I ran the business under Hirshberg's name. I ran it under his name until I got free from certain things. I continued to run this business under Hirshberg's name until I got married, and until afterwards, too. I did not change the business to Mrs. A. C. Nussbaum after I got married; I am certain of that; I do not remember if I did. I don't know. I don't know if I did run it under Mrs. A. C. Nussbaum's name, instead of Hirshberg's. I kept up the stock of goods I was running in Hirshberg's name at about the same amount, about $4,000, up to the time I married. I had to let my stock drop, because the fire came, and burned it up, and got it all damaged. There was a fire broke out, and it burned seven blocks—the whole business of Calvert. As to whether it is a fact in that fire I lost about $25 worth of goods and collected about $2,200 worth of insurance, I don't know whether I lost anything. I do not think there was any loss by the fire, because I took the goods across the way on the grass; but the rain came in the night and damaged the whole goods, and when the adjuster came he adjusted the damage at $2,200. I do not think it burned over $25 worth of goods in the fire; it might have burned that; I had no time to look.

"I do not know whether I had 500 cents at the time I married Mrs. A. C. Nussbaum, but I was still running that business up there. I cannot remember when Hirshberg left me. I did not shift my sign, and put P. S. Nussbaum up, instead of A. Hirshberg, until I came to Houston. It is not a fact that I shifted my sign from Hirshberg to P. S. Nussbaum, and began to conduct business in my own name, before I came down to Houston. I did not conduct any more business there, because I burned out the second time, and I lost everything I had, and I had no more business there until I came to Houston. I did not have that second burning out just before I came to Houston, but I had to be there and work, and I turned in and bought cotton and made the money. That is the time I bought the cotton, after I was burned out the second time. I never did open up any other stock of goods at Calvert after I burned out that last time—not that I can remember. I have not testified in this case that the way I got that cotton was in connection with my business. While I was in business I bought cotton, and I sold cotton; but afterwards I did nothing but buy cotton. Of course, I have testified in this case that the way I got the $1,500 with which I bought the property in controversy was by buying cotton. I did not testify I bought that cotton by buying it out of my business, not just before the fire. After I had the fire, I did not have any business of any consequence. My testimony that I got this cotton by taking the money to buy it out of my business was misunderstood. I said I was buying cotton after the second fire. It seems my testimony was misunderstood. (Counsel for defendant admitted that the witness gave the deposition, part of which has been introduced by plaintiffs, and that the same was fairly taken.) I say that my wife, Mrs. A. C. Nussbaum, collected the rents on the property in controversy. I suppose my wife paid some of the grocery bills, and I paid some of them, I reckon. She used some of the rent to pay them; I always gave her some money. If it is in the deposition that I was asked, 'Well, in whose name was it?' and that I answered, 'I don't remember, I believe it was under the name of A. C. Nussbaum' that I ran this business up there, I cannot deny that I gave any answer, if it is there. I suppose it must be so.

"Hirshberg is dead, I think. I cannot remember when he left Calvert. He did not stay with me after I started business in my own name. As to whether Hirshberg moved his stock of goods, too—he did not have any stock of goods; he sold it all out, and it was burned up in the second fire. There was no insurance on the second fire. I don't know whether Hirshberg or I collected the insurance on the first fire; I suppose he collected it; I do not remember whether it was he or I; we collected the money, and paid the debts, and paid for the goods. That is all we used the money for. That is what I believe it is in the deposition. It was the second fire that the Masons helped me move the stuff out. I was at the schoolhouse with my children and my wife, and I heard a fire, and when I got there the whole block was burned, and my store with it, and I did not see any goods, or anything, and as I walked around Gen. Stoddard came to me and said: 'Nussbaum, you go to the corner; there are a little goods of yours there. There is a man standing watching it.' They saved some goods, and had some goods on the corner. That was the fire when the Masons went in and saved some of my goods for me, or I would have lost every cent. There was nothing but a few rags left, and I got up next day and sold them at auction. The goods were all wet and damaged, and I was standing in ice and rain that deep (indicating), and selling them so as to have a few dollars.

"It was the first fire that burned the seven blocks. My store was in the middle of this block (indicating), and the fire commenced in this corner (indicating), and had burned back. We had no fire wagons there, or anything, and it burned six blocks down that way (indicating), the biggest kind of stores, just burned it like tinder, and burned back, and the reason I saved so much of my goods, we had time to take out most of the goods. I don't know how much goods I got burned in there, because the fire was so quick, and we threw the goods out on the other side on the grass. The next day I got a store, I believe, or part of a store, in the block above, right in the middle of the block, and I put my goods in there. I did not have another fire a few weeks after that. It started in the corner; it was a drug store, and besides that there was a restaurant that had a fire, and the fire took from that, and it burned the whole block before it came to me at all. Counsel must not say the fire broke out in my place."

### On redirect examination he testified:

"After the first fire I got $2,250 from the insurance company. With that money I paid for the goods. I paid it to McIlhaney & Hutchins and Monheim Jacobs. When I went and made arrangements for the buying of the goods, and bought the amount of goods I testified from McIlhaney, and the amount I testified from Monheim Jacobs, I did not pay for the goods when I bought them. I did not have any money to pay for the goods when I bought them, or I could have bought them in my own name that time; but they were afraid they would be taken away by the other creditors."

The plaintiffs, M. P. and S. J. Nussbaum, contend that the money with which their father, P. S. Nussbaum, paid the purchase-

money of the lots in question, was the proceeds of cotton which belonged to the mercantile business conducted by him in Calvert; that said business was but a continuation of the Huntsville business, of which the original stock of merchandise removed from Huntsville formed a part, and which was therefore a partnership business belonging to said P. S. Nussbaum and plaintiffs, the surviving children of said Nussbaum's first wife, and that, as said lots were so paid for with money, one-half of which belonged to them, they are now the owners of one-half of the lots so purchased and paid for.

Defendants contend that said lots were paid for with money made by P. S. Nussbaum in the purchase and sale of cotton in 1870 and 1871, after his stock of merchandise in Calvert had been destroyed by fire and he had become insolvent, and after he had assigned all his assets to a trustee and had been adjudged a bankrupt; that by virtue of the deed from P. S. Nussbaum to his wife, Augusta C. Nussbaum, he conveyed the lots in question to her, and the same became her separate property, and passed by her will to defendants Henry Nussbaum, Mollie Saper, and Bertha Blumenthal, and that they are now the owners of same, subject only to the life interest of P. S. Nussbaum, and the legacies mentioned in said will. They also plead the statute of limitations in bar of appellees' right to recover.

The case was tried before a jury upon special issues submitted to them by the court, and to such submitted issues made answer as follows:

First. P. S. Nussbaum was engaged in the mercantile business in Huntsville at the time of the death of his first wife, Ernestine Nussbaum.

Second. At the time of the death of his first wife, P. S. Nussbaum had on hand a stock of merchandise.

Third. P. S. Nussbaum continued to conduct the mercantile business at Huntsville from the death of his wife until he moved to Navasota.

Fourth. P. S. Nussbaum moved a stock of merchandise from Huntsville to Navasota.

Fifth. The goods moved from Huntsville formed a part of the stock of goods he had at Navasota.

Sixth. The property in question was paid for from the proceeds of cotton purchased with money derived from the mercantile business at Calvert.

Upon these answers the court entered judgment for plaintiffs, M. P. and S. J. Nussbaum, for a one-half undivided interest in the lots involved in this suit, and for possession thereof, subject only to the right of defendant P. S. Nussbaum to use and occupy said property as his homestead so long as he desires to so use the same.

[1] By appellants' first assignment they insist that the court erred in admitting testimony, offered by plaintiffs, showing or tending to show that a trust or resulting trust existed in favor of plaintiffs in the property in controversy, because there were no pleadings under which such testimony was admissible. Their contention is that plaintiffs' suit, as shown by their petition, is one for a partition only of land alleged to be owned jointly by plaintiffs and defendants, and that under such pleadings plaintiff should not have been permitted to prove a resulting trust in said land, from the payment of purchase money; that, before such facts could have been proven, proper allegation of their existence should have been made.

It has already been shown that by their supplemental petition plaintiffs alleged that they were the owners in fee simple of an undivided one-half interest in said property and that they prayed for judgment against all of the defendants for title and possession of their one-half of said land. It is not necessary for a plaintiff who relies on an equitable title to plead specifically the facts on which his title is based. Customary allegations in suits of trespass to try title are sufficient to authorize proof of any fact tending to establish his title. Wade v. Boyd, 24 Tex. Civ. App. 492, 60 S. W. 360; Edwards v. Barwise, 69 Tex. 85, 6 S. W. 677; Kauffman & Runge v. Brown, 83 Tex. 41, at page 48, 18 S. W. 425. Appellants' first assignment is overruled.

Appellants' main contention is presented by their second, third, fourth, and fifth assignments, and is in substance that the evidence as a whole is too vague, meager and indefinite to support a finding, first, that merchandise of any quantity or of material value, a part of the stock of merchandise formerly owned by P. S. Nussbaum and his first wife at Huntsville, was ever removed to and became a part of the Navasota business, conducted by said Nussbaum under the name of H. Hirshberg; and, second, that there were any funds belonging to or coming from the business at Huntsville, Navasota, and Calvert, or either of them, used in paying the purchase money for the land in question—it being further contended that, as appellees' suit is one seeking to ingraft a resulting trust in said land, by showing that money belonging to them was used in paying one-half of the purchase price, the burden was upon them to show with reasonable certainty that their money was so used, and that the evidence necessary to ingraft a resulting trust in said land as against the holder of the legal title thereto must be clear, full, and convincing, and of such a character as to take the matter out of the realm of conjecture, or presumption, and therefore, as the evidence in this case is not of such character, the judgment rendered in favor of appellees is not supported by sufficient evidence.

Appellants Bertha Blumenthal, Mollie Saper, and Henry Nussbaum are admittedly the holders of the legal title to the whole of the land in controversy. Appellees' suit is one in which they are seeking to establish a resulting trust in an undivided one-half interest in said land, and claim that one-half of the money paid for the land belonged to them,

and that it was in the hands of P. S. Nussbaum as trustee for them, and was paid to the vendor as one-half payment for said land, and therefore they became and are the equitable owners of a one-half interest in said land.

[2, 3] In such suits the general rule, as established by our state courts, is that the burden of proof to establish that any such trust funds were used in paying for such land is upon the plaintiff, pleading an equitable title, and that such proof must be clear and satisfactory, and must with a reasonable degree of certainty trace such trust funds, if any, into such payment. Joske v. Irvine, 91 Tex. at page 582, 44 S. W. 1059; King v. Gilleland, 60 Tex. 271; Goodrich v. Hicks, 19 Tex. Civ. App. 528, 48 S. W. 798; Albrecht v. Albrecht, 35 S. W. 1076; 39 Cyc. 160, 166; Meyer v. Holle, 83 Tex. 623, 19 S. W. 154; Zundell v. Gess, 73 Tex. 144, 10 S. W. 693; Glasscock v. Hamilton, 62 Tex. 143; Wright v. Moline Plow Co., 40 Tex. Civ. App. 434, 90 S. W. 905; Texas Moline Plow Co. v. Imp. Co., 32 Tex. Civ. App. 343, 80 S. W. 1042.

[4] The rule that a new trial will not be granted, or the judgment reversed and cause remanded, where there is a scintilla of evidence to support the verdict of the jury, does not prevail in this state. Joske v. Irvine, 91 Tex. at page 582, 44 S. W. 1059; article 1639, Revised Civil Statutes of Texas; Railway Co. v. Schmidt, 61 Tex. 283.

We do not think there is any clear and satisfactory evidence in the entire statement of facts showing that P. S. Nussbaum had any portion of the Huntsville stock of goods, which remained after the death of his wife, Ernestine, in his possession, and which he removed to Navasota, of any material value, or that it exceeded in value the community debts of the first marriage shown to have been due in Houston and elsewhere, and which, by his undisputed evidence, he is shown to have paid after the death of his said wife. Nor do we think any funds belonging to appellees have been traced into the payment for any portion of the purchase price of the land in controversy by clear and satisfactory evidence. The mere statement made by P. S. Nussbaum to appellees that they owned an undivided one-half interest in the land in controversy through their mother, if he made same, does not, in our opinion, when taken with the other facts shown by the evidence set out above, show that money belonging to appellees was used in paying one-half of the purchase money for said land.

[5, 6] We think the plaintiffs in such suits as this must disclose all the facts and circumstances connected with the transaction, so as to make it manifest that the remedy they ask is just and equitable. It must be made to appear that it is inequitable to withhold from them the relief they seek, for, if their equities, if any, are nearly balanced, the legal title will not be disturbed. We do not think such showing has been made, and we therefore conclude that the contentions of appellants under their second, third, fourth, and fifth assignments should be sustained.

The trial court excluded, when offered in evidence by appellants, certified copies of the following papers: (1) The voluntary petition in bankruptcy filed by P. S. Nussbaum on the 23d day of September, 1870, together with the schedule of assets of said Nussbaum; (2) a certified copy of the decree adjudging said Nussbaum a bankrupt, of date October 4, 1870; (3) a certified copy of the discharge in bankruptcy of said Nussbaum, of date June 2, 1871. The exclusion of such evidence is the ground on which appellants base their twelfth, thirteenth, fourteenth, and fifteenth assignments.

[7] We think these assignments should be sustained. Appellees based their right to recover in this suit upon the ground that their father, P. S. Nussbaum, after his second marriage, to wit, in 1871, invested funds belonging to the community estate of himself and his first wife, Ernestine, the mother of appellees, who died in 1867, in the land in controversy, that he had the same deeded to his second wife, Augusta C. Nussbaum, and that one-half undivided part of said land belongs to them by reason of the use of said community funds in the purchase of same. It therefore became and was very material that appellants show, if they could, that P. S. Nussbaum had filed a petition in bankruptcy in September, 1870, in which he swore that he had scheduled and turned over to the bankrupt court all of his assets, and that upon hearing the court had adjudged him a bankrupt and discharged him from his debts, thus tending strongly to show that as late as September 23, 1870, said P. S. Nussbaum had no assets belonging to said above-mentioned community estate, nor funds arising therefrom, and therefore had no funds belonging to said estate to invest in said land in 1871. This evidence, perhaps, would have been given much weight by the jury in determining whether P. S. Nussbaum used funds of said estate in paying for said land, especially in view of the fact that P. S. Nussbaum had testified that his entire stock of merchandise in Calvert had been destroyed the second time by fire in the early part of 1870, and that he had no insurance on said stock, and that just after said fire he had neither goods nor money.

[8] By appellants' sixteenth assignment it is insisted that the court should have rendered judgment for appellants because the undisputed evidence shows that appellees' cause of action, if any they had, is barred by the ten-year statute of limitation.

There is no merit in appellants' contention. While it is true that P. S. Nussbaum, on the 27th of September, 1902, executed and delivered to Mrs. Augusta C. Nussbaum a deed by which he conveyed the land in con-

troversy to her, thus showing an intention to hold adverse to appellees, and it is also true that Mrs. Augusta C. Nussbaum disposed of all of said land by her will, which was filed for probate on the 23d day of December, 1902, and thus tending to show an adverse holding to appellees, appellees both testified that P. S. Nussbaum was in possession of said property from the date of the death of Mrs. Augusta C. Nussbaum in 1902 up to February, 1915, the date of filing their original petition herein, and while holding such possession told appellees, after the probate of the will of Mrs. Augusta C. Nussbaum, that he was not holding adverse to them. The evidence may have raised the question of ten-year limitation, as P. S. Nussbaum had no interest whatsoever in such portion of the land as was owned by appellees, if any. The evidence, however, on this question is not undisputed. The sixteenth assignment is overruled.

What has been said disposes of all of appellants' assignments. For the errors pointed out, the judgment of the trial court is reversed, and the cause remanded.

Reversed and remanded.