## McCOMBS et al. v. ABRAMS et al.
### No. 9300.

Court of Civil Appeals of Texas. Galveston.
Feb. 8, 1930.

Dissenting Opinion Feb. 26, 1930.
Rehearing Denied May 1, 1930.
Additional Opinion May 9, 1930.

Henderson, Kidd & Henderson, of Cameron, Rucks & Enlow, of Angleton, John K. Freeman, of Cameron, John B. Atkinson, of Waco, and McCormick, Bromberg, Leftwich & Carrington, of Dallas, for appellants.

C. R. Wharton, W. H. Wilson, and E. J. Fountain, all of Houston, Louis J. Wilson, of Angleton, and Robert A. John, of Houston, for appellee Texas Co.

W. H. Wilson, of Houston, Louis J. Wilson, of Angleton, and Tom Scurry and Murphy W.

Townsend, both of Dallas, for appellees Abrams and others.

LANE, J.

The undisputed evidence shows that on and for some time prior to the 23d day of December, 1897, up to the 19th day of July, 1904, at which time Florence McCombs died, Paul McCombs and Florence McCombs were husband and wife; that Florence McCombs left surviving her her husband, Paul McCombs, and three children, namely, Mora, who became the wife of Ben P. Atkinson, Helen, who became the wife of Charles Overton, and Melvorne, a son; that on the 23d day of December, 1897, the Land Mortgage Bank of Texas, through its agent of Tarrant county, Tex., by its contract with Paul McCombs, authorized McCombs to sell certain lands owned by it, estimated to be 1,700 acres, situated in Brazoria county, Tex., a part of the George Tennille league, at $6 per acre; McCombs to receive for his services any sum he might receive therefor over said $6 per acre. By the terms of such contract McCombs was to survey and subdivide the land into 40-acre tracts.

McCombs divided the land as he agreed to do, and inclosed the entire tract with a fence, which was paid for by the bank.

The contract mentioned was to expire at the end of one year. No sale was made under it. In 1901 McCombs had some arrangement with W. T. Humble, agent of the bank, to either sell the land or to buy it himself, and on the 2d day of January, 1900, Humble wrote McCombs that the bank would sell him the land, less two 50-acre tracts, which he described, for $6,000, to be paid $1,000 cash, $1,000 in three years, $1,000 in four years, and $3,000 in five years, all notes to bear 7 per cent. interest, provided the offer was accepted by February 2, 1900. McCombs did not purchase the land under the terms proposed by Humble. In February, 1900, McCombs saw Humble and Humble told him that, in order for him (McCombs) to be repaid for the work he had already done, for which he had received no remuneration, he (Humble) would place the legal title to the land in McCombs by deed, for a recited consideration of $1,000, as cash paid, which was not in fact paid, and the further consideration of $6,800 to be paid; so that under such arrangement McCombs might sell it to some one. Under such arrangement, on the 16th day of February, 1901, the Land Mortgage Bank, for a recited consideration of $7,800, $1,000 cash, and seven notes of McCombs, the first for $800 and the other six for $1,000 each, payable to the bank, respectively, on or before March 1, 1902, 1903, 1904, 1905, 1906, 1907, and 1908, the land involved was conveyed.

Thereafter McCombs tried to sell the land, but for a long time was unsuccessful and finally went to W. H. Abrams, for whom he worked, and told him of his option. He told him that the land at the price given him was a big bargain; that he thought the land was worth $10 per acre, and that he wanted Abrams to get the benefit of the bargain, and that if he would take the land at $6,800, as proposed, he (McCombs) would not ask Abrams to pay any part of the $1,000 recited in the option deed as a cash payment, as that was recited so that, in case McCombs might sell for $7,800, he would get something out of it for himself. Abrams told McCombs that he would not buy the land unless McCombs would join him in the purchase. McCombs told Abrams that he could not join him in the purchase, and Abrams told him that he (Abrams) would advance his half of the purchase price, and that McCombs could pay it back when he could. McCombs agreed to join in the purchase if Abrams would let him pay his part of the purchase money out of his salary. Abrams agreed to McCombs' proposition and had McCombs write him a letter embodying the terms of the agreement between them. At the time such agreement was had, the deed from the bank to McCombs had not been delivered, but was held by Humble for the bank. The letter written by McCombs to Abrams was as follows:

"Dallas, Texas, 25 March, 1901.
"Mr. W. H. Abrams, Dallas, Texas.

"Dear Sir: I have purchased from the Land Mortgage Bank of Texas, W. T. Humble, Atty in Fact and General Agent, 1600 acres of land in Brazoria County, Texas, 4 miles west of Columbia; as fine farming land as any in South Texas, every acre arable land; raises fine sugar cane, or rice. All under fence, when I last saw it, for I built the fences myself. The price I paid was $4.00 per acre and the surrounding lands cannot be purchased for less than $10. to $15. per acre.

"The terms are $800.00 the first of March, 1902, and $1,000.00 per year for each succeeding year for 6 years; with 7% interest.

"If you will pay the $800 I will have the deed made to you and me, jointly, or will convey you an undivided one half interest myself; and I will pay out my share of the balance of the purchase money.

"I shall be willing to return you one-half of the above $800 out of my salary at the rate of $100 per month.

"If this will meet your ideas, I would like to go to Fort Worth and close the matter at once; as my contract will expire in a very few days.

"Yours, Paul McCombs."

Abrams accepted McCombs' proposition and paid, by his check, the $800 note recited as a part consideration in the deed from the bank to McCombs, and the deed was delivered to McCombs by the bank.

By his deed bearing date as of February 16, 1901, McCombs conveyed a one-half of the land to Abrams. The deed recited the consideration as $400 cash and other valuable considerations, and also recited that such conveyance was subject to debts for the purchase money and all the conditions in the deed from the bank to McCombs.

The deed last mentioned was acknowledged before J. D. Crutcher, notary public.

In connection with the execution of the last-mentioned deed, McCombs prepared, signed, and delivered to Abrams the following instrument:

"16 February, 1901.
"State of Texas, Dallas County.

"Whereas, I have this day sold to W. H. Abrams an undivided one-half interest in and to certain lands aggregating about 1700 acres in Brazoria County, Texas, upon which there is yet due about $6000.

"Now, as part of said sale, I hereby agree that in case I should be unable or unwilling to pay my part of the purchase money still due on said lands, then said Abrams shall have the right to pay said purchase money in full and receive title to the entire tract of land, allowing me to retain so much of same as I may have paid proportional to the whole amount of the purchase money.

"Paul McCombs."

After Abrams had paid the $800-note executed by McCombs as the first payment on the land, which is recited in the deed from the bank to McCombs, McCombs repaid to Abrams. one-half, or $400, of such sum, and this sum was all that was ever paid by McCombs of the purchase money for the land.

During the years 1905 and 1906 McCombs was practically a bankrupt, and his only income was his salary of $150 per month, and he had given up all hope of being able to make any further payments on the land notes, and he so told Abrams, and in a written statement of date March 1, 1906, the following appears:

"As McCombs has failed and is unable to pay any further part of his half of the purchase price of the land above described, except the first $400.00, he has on this, the 1st day of March, 1906, executed to W. H. Abrams a conveyance of all his interest in said land; and said Abrams has conveyed to said McCombs 100 acres of land, in full for the $400.00 he paid." .

Complying with the conditions stated in the above instrument, McCombs by his deed of date March 1, 1906, conveyed the land in controversy to W. H. Abrams, and Abrams then reconveyed to McCombs 100 acres thereof.

One hundred acres of the original 1,700 acres had been lost to Tenille in a suit for which the bank credited the land notes with $400, and Abrams paid all the balance of the purchase money notes, except the $400 paid by McCombs.

Mrs. Florence McCombs, wife of Paul McCombs, as already stated, died on the 19th day of July, 1904. She left a will by which she devised to her three children, hereinbefore named, all of the estate of which she possessed at the time of her death. This will was probated under the supervision of J. D. Crutcher, attorney, on the 2d day of September, 1905, but no administrator or executor was appointed.

On the 16th day of January, 1906, Paul McCombs filed his application to be appointed administrator of the estate of Florence McCombs, with will annexed. Paul McCombs was duly appointed as such administrator on the 16th day of June, 1906, and he duly qualified as such, and J. D. Crutcher and two others were appointed appraisers.

Among the property pointed out by Paul McCombs to the court and the appraisers as the community estate of himself and his deceased wife, Florence, is the following:

100 acres of the George Tenille survey
  in Brazoria County, valued at,.... $400.00
42 acres in Aransas County,......... 200.00
And about ten acres in city lots in the
  City of Rockport, Aransas County,
  valued at...................... 100.00

The inventory and appraisement as made by McCombs was approved by the appraisers as correct, and was also approved by the probate court.

On the 12th day of November, 1907, Mrs. Mora Atkinson, joined by her husband, Ben Atkinson, and Melvorne McCombs, in an instrument executed and delivered by them to Paul McCombs, recites:

"In consideration of the full and final settlement this day made between the grantors and the grantee, Paul McCombs, of all matters relating to the separate estate of Mrs. Florence J. McCombs, deceased, and to the community estate of Paul McCombs and Florence J. McCombs, do hereby transfer and convey and quit claim unto the said Paul McCombs, all our right, title claim, and interest in or to all property, real or personal, wherever situated, belonging to the community estate of Paul McCombs and Florence J. McCombs, or to the separate estate of Florence J. McCombs.

"To have and to hold the same unto the said Paul McCombs, his heirs and assigns, forever."

This instrument was acknowledged by Melvorne McCombs before J. D. Crutcher, notary public, who was one of the appraisers of the property of the estate of Florence McCombs and who with others inventoried the 100 acres in Brazoria county conveyed by Abrams to McCombs, as belonging to the community

estate of Paul McCombs and his deceased wife, Florence.

W. H. Abrams having become the owner of the land in controversy through the two deeds of Paul McCombs, the last one of date March 1, 1906, leased such land to the Producers' Oil Company on the 23d day of December, 1914, for the purpose of prospecting for oil, gas, and sulphur. Under such lease, lessee was given "ingress and egress upon the land at any and all times to prospect, drill, mine and otherwise operate under the lease, to erect, maintain, and remove all necessary or proper structures." Such lease conveys all the oils and other minerals on or under the land, subject only to certain royalties thereby expressly reserved. Such lease was transferred by the Producers' Oil Company to the Texas Company, and such company extracted large quantities of oil from the land.

On the 28th day of December, 1920, Melvorne McCombs, Mora Atkinson, joined by her husband, Ben Atkinson, and Helen Overton and husband, Charles Overton—Melvorne, Mora, and Helen being the sole heirs of Mrs. McCombs, deceased, and the devisees under her will—brought this suit in the district court of Brazoria county, Tex., in trespass to try title, praying for a recovery of a one-fourth undivided interest in two certain tracts of land situated in Brazoria county. The suit was originally brought against W. H. Abrams, Paul McCombs, and the Texas Company, but, as W. H. Abrams died pending the suit, his heirs, Harold J. Abrams, Lucien Abrams, and Florence Kelly and husband, and Murphy W. Townsend, as trustee under W. H. Abrams, were made parties defendant.

Plaintiffs alleged that Melvorne McCombs, Mora Atkinson, and Helen Overton were the owners of a one-fourth undivided interest in the two tracts of land described in their petition, said petition being in the usual form of petitions in suits of trespass to try title; they also sue for the value of a large quantity of oil, which they allege was unlawfully extracted from the land and converted by the defendants.

Without qualifying such formal trespass to try title pleading and in reply to contentions of defendants, plaintiffs assert that deeds relied upon by defendants are invalid as against the plaintiffs and seek to set aside the deeds, being a deed by Paul McCombs to W. H. Abrams, dated March 1, 1906, and a deed by two of the three children of Paul McCombs, Melvorne J. McCombs and Mrs. Mora Atkinson, to Paul McCombs, dated November 12, 1907, with release to Paul McCombs as administrator of the estate of their mother, executed and delivered with the delivery of such deed, hereinbefore mentioned.

They allege that they each acquired an undivided interest in the land from their mother at the time of her death in July, 1904, she leaving a will devising her estate to them share and share alike; the two who executed the releases and deed of November, 1907, claim that these were procured by fraud. All of them claim that the deed of March 1, 1906, was ineffective to pass and did not operate to pass their title to the land.

The trial court refused to submit any issue to the jury and sustained the request of all of the defendants for an instructed verdict. Judgment for all of the defendants was entered pursuant to the instructed verdict; a one-sixth undivided interest disclaimed to Mrs. Helen Overton was decreed in her to 100 acres in the northwest corner of the land conveyed by Abrams to Paul McCombs.

The plaintiffs have appealed and as causes for the reversal of the judgment contend: (1) That the evidence raised the issue as to whether the deed of Paul McCombs to W. H. Abrams, of date March 1, 1906, passed the title of the plaintiffs as in exercise, by Paul McCombs, of his power as community survivor, and therefore the court erred in instructing a verdict for defendants; (2) that the instruction of a verdict for defendants was erroneous, in that the evidence raised the issue as to whether or not the land in controversy, or any part thereof, was the separate estate of plaintiffs' mother, which passed to them through her will; (3) that the releases and the quitclaim deed of Mora Atkinson and Melvorne McCombs, of date November 8 and 12, 1907, purporting to convey to Paul McCombs all their interest in their mother's estate, constituted no basis for the instructed verdict, as the evidence showed that such instruments were fraudulently obtained; (4) that the evidence raised the issue as to whether any of the defendants were bona fide purchasers and entitled to protection under their plea of innocent purchaser, etc., and therefore such plea formed no basis for the instructed verdict; and (5) that the evidence raised issues as to whether plaintiffs were barred by the limitations pleaded by defendants from recovery.

In our preliminary statement we have stated all the material transactions shown by the evidence which took place prior to the filing of this suit, and in our discussion of the issues raised by the parties in their respective briefs, with reference to such transactions, we shall as much as possible refrain from repeating the facts as found in such preliminary statement.

██ We think the court correctly instructed a verdict for defendants, in so far as plaintiffs' claim to an interest passing to them through their mother as her separate estate was concerned: First, because there was no sufficient evidence to raise the issue or to support a verdict engrafting a parol trust in favor of the separate estate of plaintiffs' moth-

er, through whom they claim, upon the legal title held by Paul McCombs. The testimony offered for the purpose of showing a parol trust in favor of plaintiffs' mother was hearsay, especially as to W. H. Abrams and those holding under and through him, and was inadmissible. If, however, such testimony was admissible, still there is no showing that one dollar of Mrs. McCombs' money was in fact used in part payment for the land. The hearsay testimony was given by the witness Crutcher, who testified that in 1901, before the bank conveyed the land to McCombs, McCombs told them that he had an option to buy the land for $4 per acre on terms, and that he intended to buy a half interest for his wife on terms of $800 cash and $1,000 per year thereafter; that his wife's brother had given his wife one-half of the cash payment, and that later McCombs told them that he had taken the $400 given to his wife and had paid it to Abrams. McCombs denied that he made any such statement, and stated that he never paid any money of his wife's on the purchase price of the land, and there is absolutely no evidence that any money of Mrs. McCombs ever was paid in the purchase of the land.

■ Second, if it be conceded that $400 of the separate funds of Mrs. Florence McCombs was invested by Paul McCombs in the lands in controversy as the trustee of Florence McCombs, still the deed of Paul McCombs of date March 1, 1906, conveying the land to W. H. Abrams, in the absence of a showing of fraud, in view of the terms of the contracts of McCombs with Abrams, of date February 16, and March 25, 1901, hereinbefore set out, passed both the legal and equitable title to the land to W. H. Abrams.

It is shown that whatever conversation, if any, Paul McCombs and his wife had relative to the proposed investment of $400 of her money in the one-half interest in the land took place prior to the delivery of the deed by the bank to McCombs on March 25, 1901. It therefore appears that, if any such agreement was had, the wife made Paul McCombs her agent to purchase an interest in the property for her, and, in order for Paul McCombs to complete such purchase, under the terms given by the bank, it was necessary for him to get Abrams or some one else to go into the deal with him, as trustee, and put up an additional $400 to make up the $800 which was to be paid before the bank would deliver to McCombs the deed conveying to him the land. It is admitted by plaintiffs that Paul McCombs did not have $400 to complete the initial payment of $800. Let it be conceded that Mrs. McCombs gave Paul McCombs $400 of her money to invest in the land, the undisputed evidence shows that, to induce W. H. Abrams to go into the deal so as to enable his wife to make her $400 investment, Paul McCombs agreed with Abrams that whatever portion of the property Abrams paid for

should belong to him in proportion to the original purchase price of the land. At the time of such agreement, neither Abrams, Florence McCombs, nor Paul McCombs had any title to the property. The title remained in the bank, its deed had not been delivered to McCombs, and no part of the purchase price had been paid. Florence McCombs, if she did so, was enabled to pay her $400 and make an investment only by reason of the fact that Abrams was induced to go into the deal because of the agreement which Paul McCombs, as her trustee, made with him. Florence McCombs delegated Paul McCombs to close the deal for her and act for her in the transaction. This is a necessary conclusion from the testimony of the two Crutchers, witnesses for plaintiffs, as to what Paul McCombs told them, their testimony being the only evidence tending to show that any money of Mrs. McCombs was paid for the land. The source of Florence McCombs' interest was the agreement inducing Abrams to go into the deal. Her title can rise no higher than its source. She was thereafter enabled to hold on to her $400 interest only because Abrams, induced by the agreement with Paul, continued to pay the purchase money notes. Had Abrams not paid the notes under the agreement, Florence would have lost her $400 investment when the second note matured. Plaintiffs make no contention that she or Paul paid any more on the purchase price, or tendered or offered any other sums to be applied on the purchase price. As said in Johnson v. Smith, 115 Tex. 193, 280 S. W. 158, 161: "But for the payments procured by means of Elymas Johnson's promise to hold for plaintiffs in error, there would have been no divestiture of title out of Sherrod [the grantor]. * * * Considering Elymas Johnson's inability to meet the notes, he would get only benefit from the execution of the parol agreement through the discharge of his personal obligation on the notes."

In Howard v. Davis, 6 Tex. 174, our Supreme Court held that a mortgage to secure purchase money given at the time of the conveyance by a trustee would be valid and binding on the property, that the whole transaction should be regarded as but one, and that the conditions of the mortgage be considered as incorporated in the conveyance. The court in that case said: "The legal estate might pass momentarily to the trustee, but would immediately revest in the vendor with the condition, substantially, that it should be extinguished, on the payment of the purchase money. It might be contended, though it has not been argued, that in this aspect, the vendor would hold the property affected by the trust. This might, in a certain sense, be conceded; but the trust could become effectual and operative in the cestui que trusts, only by the payment of the purchase money. This condition entered into its creation, and is an

essential element of the trust. Until payment, the vendor has the best right; the superior title."

If we should assume that $400 of Mrs. McCombs' money was used by Paul in part payment of the initial payment of $800 on the property in the transaction with W. H. Abrams, Paul was evidently trying to secure land for his wife, and to do so he entered into a contract with Abrams to secure his assistance in acquiring the same, one of the conditions of such contract being that McCombs was to pay his part, and that this was a condition precedent that McCombs had to comply with before he could acquire the land, and, in order to secure title to such proportionate part thereof as he should pay for, he had the power, independent of his wife, to make any agreement in relation thereto necessary to accomplish that end.

The interest of Mrs. McCombs was acquired by and through and under the agreement inducing Abrams to go into the transaction and inducing Abrams to advance all of the purchase money, except the $400. McCombs, her agent, delegated by her to make the deal, certainly had authority to do that which was necessary to complete the transaction.

But whether Paul McCombs was authorized or not, Florence McCombs and plaintiffs, after her death, permitted Abrams to continue to pay until all the deferred payments were made, and permitted him thereby to protect their $400 investment, under his agreement with Paul McCombs. He was the source of their claim, and their claim can raise no higher than its source. Plaintiffs cannot now claim the benefit of Abrams' acts and repudiate the agreement under which they were performed. They cannot claim the benefit of the investment made by Paul McCombs in behalf of their mother, and repudiate the agreement by and through which McCombs was enabled to make the investment and protect it. They cannot assert an interest derived from this transaction and in the same breath deny its validity.

There is nothing to indicate that Paul McCombs, in making the agreement with Abrams, was acting outside the scope of his agency. We know he was authorized to act for her in closing the deal, and we know his agreement with Abrams was part of the transaction and induced Abrams to go into it.

In Smith v. Olivarri, 127 S. W. 235, 238, 239, the following quotation from the opinion of the court sufficiently indicates the question involved, to wit:

"The sisters of appellant cannot be heard to claim that their husbands represented them in obtaining possession of the property, but that they are not bound by the agreements accompanying the transfer of the property. They obtained only such an estate as arose from the contracts made by the husbands, and they cannot be heard to approve a part of the agreement and to reject that part which did not suit them. They got the estate incumbered with the whole agreement in connection with it. It would be setting a premium on fraud to allow them to appropriate the estate of their brother under a plea that, while their husbands could agree that the land should be conveyed to them, they were not bound by the agreements made by the husbands to induce the conveyance of the land. The oral agreement, if any, was the very basis of the sale, and cannot be rejected. Appellant offered to do full equity in regard to the debts with which the property was incumbered, and to fully protect appellees from any loss by reason of the mortgage given by them.

"The evidence showed that the husbands of appellant's sisters were acting as agents for their wives in the purchase of the property from appellant, and the wives do not repudiate the agency, but claim the right to accept and abide by certain portions of the contract made by their husbands, and to reject other portions of it. This they cannot do. The evidence of appellant shows that the contract with the husbands of his sisters was not only for his benefit, but was absolutely necessary to obtain a loan to protect the interests of his sisters in the Elite Hotel property. That the husbands were acting as agents of the wives is not questioned, and there is nothing to indicate that they were acting beyond the scope of their agency. The law is settled that the husband may be the agent of the wife to make contracts binding her separate estate, but the agency will not be presumed merely from the marital relationship. (citing authorities) The contract, whatever it may have been, with appellant was made by the husbands of appellant's sisters with their full knowledge and consent, and was fully authorized by them, and was for the benefit of their separate estate. The wives deny the authority of the husbands to make the contract which appellant claims was made. They admit the authority of the husbands to contract, but they deny that they made the contract sworn to by appellant."

Under the terms of the contract between McCombs and Abrams, Abrams paid all of the purchase price but the $400, and was entitled to all but 100 acres of the land. If Paul McCombs' deed of March 1, 1906, was not binding upon the $400 interest of the separate estate, the separate estate of Florence McCombs now would be entitled to no more than the 100 acres which Abrams conveyed to McCombs, and in equity could not recover any portion of the land which Abrams in good faith had paid for, developed, and improved.

We have reached the conclusion that the undisputed evidence shows that whatever interest Paul McCombs acquired in the land was community property of himself and wife;

that such interest was only so much or such proportionate part thereof as $400 would pay for; that to carry out the terms of the contracts entered into between Paul McCombs and W. H. Abrams, of date February 16, 1901, and March 25, 1901, by which each party was to own such proportionate part of the land as the money he put into the transaction would pay for, W. H. Abrams reconveyed to Paul McCombs 100 acres of land, which McCombs accepted as his part of the land under his contracts with Abrams. The undisputed evidence shows that, at the time, March 1, 1901, Paul McCombs conveyed the land to W. H. Abrams and Abrams reconveyed to McCombs 100 acres thereof, the community estate of the McCombs was indebted $3,000 or more for their part of the purchase price of the land; that Abrams paid all the purchase money for the land, and that in the latter part of the year 1906, McCombs repaid to Abrams $400 of such money, and that that sum was all that was paid by McCombs of the purchase price of the land.

The facts as above stated, being shown by the undisputed evidence, gave Paul McCombs the authority, after the death of his wife, to sell the interest, apparently owned by the community estate of himself and wife, to pay community debts.

Though we have searched the statement of facts, we have been unable to find any evidence tending to show that McCombs' sale of the land to Abrams was made in bad faith, but we find that the sale was made in good faith to pay the debts of the community estate, only after McCombs found himself unable to otherwise pay such debt.

For another good and sufficient reason, we think the deed of Paul McCombs to W. H. Abrams of date March 1, 1906, passed the title to the land to Abrams. As already shown, Paul McCombs, finding himself unable to purchase and pay for the land under the terms given him by the owners, the bank, entered into an agreement with W. H. Abrams, evidenced by instruments signed by him and delivered by him to Abrams, that if Abrams would join him in the purchase of land, one of which reads as follows:

"16 February, 1901.
"State of Texas, Dallas County
"Whereas, I have this day sold to W. H. Abrams an undivided one-half interest in and to certain lands aggregating about 1700 acres in Brazoria County, Texas, upon which there is yet due about $6000.00.

"Now, as part of said sale, I hereby agree that in case I should be unable or unwilling to pay my part of the purchase money still due on said land, then said Abrams shall have the right to pay said purchase money in full and receive title to the entire tract of land, allowing me to retain so much of same as I may have paid proportional to the whole amount of the purchase money.

"Paul McCombs."

Abrams accepted McCombs' proposition and thereafter paid all of the purchase price, and thereafter McCombs repaid to Abrams $400, and no part of the purchase price was paid by McCombs, except said $400.

Under the facts shown, it is evident that plaintiffs never had any title to the land and never inherited from their mother any right, save and except a chance to obtain a title dependent upon payment of the purchase price by their father, and that chance, by reason of their father's agreement with Abrams, was measured as to quantity of interest by the portion of the purchase price which their father, Paul McCombs, might eventually pay. As before stated, he paid only $400. This right terminated when their father carried out the contract made by him with Abrams, and·the title vested in Abrams when he completed the payment of all the purchase money.

■ The power of the survivor to perform agreements made during the existence of the marriage is well settled by numerous authorities. Stramler v. Coe, 15 Tex. 211; Brewer v. Wall, 23 Tex. 586, 76 Am. Dec. 76; Garnett v. Jobe, 70 Tex. 696, 8 S. W. 505; Hilburn v. Harris, 2 Tex. Civ. App. 395, 21 S. W. 572.

In Stramler v. Coe, the survivor performed a contract or bond to convey real estate which had been executed by him during the marriage. The contract or bond recited no consideration, but a valuable consideration was established by oral testimony. In that case the court said:

"This is one of those causes, now becoming too frequent, in which the heirs of a deceased wife are attempting to claim the one-half of the community property, and to subvert the acts and alienations of their father, done by him during the existence of the community, and also after its dissolution by the death of his wife. Controversies of this character are painful in their nature, and the presumption must always be against the child who disavows the acts of the author of his life, and virtually or expressly charges him with fraud and wrong, in squandering and alienating property not his own, but that of his children. 'Honor thy father and mother' is a command, not only of the Decalogue, but of nature; and suits in which rights can be claimed only through the alleged turpitude of a parent, are not to be encouraged. These remarks have no special application to the parties in this cause, in fact, not so much as in others, for, from the evidence, it appears that the transaction was never satisfactory to the wife, and there is the more excuse for the attempt at repudiation, on the part of the children; and this brings us to the main question, that is, whether the bond, although unsatisfactory to the wife, was binding on

her and on her heirs claiming a share of the community in her right. * * *

"The conveyance of Price, after the death of his wife, being but the completion of a pre-existing arrangement, made during the existence of the matrimony, must be held as valid as if made in the life time of the wife. As surviving partner, he had authority to perfect a transaction commenced during the partnership, and this rule is of special force and application in cases of conjugal partnership, in which there is a head that has the entire control of the affairs of the partnership, with no restraint except that it shall not be abused with fraudulent intent against the rights of the other partner.

"Such being the rights of the husband, as head of the community and as surviving partner, the heirs of the wife cannot repudiate his acts and contracts, begun before but finished after the death of their mother. They received their mother's interest, but encumbered with burdens which have the same binding force and effect upon them, as they have upon the husband and surviving partner."

Paul McCombs in executing the deed to Abrams did no more than Abrams could have forced him to do.

■■ We now come to a consideration of appellants' contention that the releases executed and delivered to Paul McCombs, as administrator of the estate of Florence McCombs, by Mora Atkinson, joined pro forma by her husband, Ben Atkinson, and by Melvorne McCombs, by the terms of which they declared that Mora and Melvorne had each received the sum of $4,953 from Paul McCombs in full settlement of any and all claims for any distributive share, or otherwise, against the estate of Florence J. McCombs, deceased, and against both community and separate estate, and that such settlement should constitute a final and complete discharge from them to Paul McCombs, individually and as administrator, and to the sureties on his bond (said receipt being dated March 8, 1907), and the quitclaim deed executed and delivered by them to Paul McCombs on the 12th day of November, 1907, by the terms of which they quitclaimed and transferred to Paul McCombs "all their right, title, claim, and interest in or to all property, real or personal, wherever situated, belonging to the community estate of Paul McCombs and Florence J. McCombs, or to the separate estate of Florence J. McCombs," the consideration cited being of the full and final settlement made between the grantors and grantees of all matters relating to the separate estate of Mrs. McCombs, deceased, and the community estate of Paul and Florence McCombs, did not divest the plaintiffs of any interest they had in or to the land in controversy, because such instruments were fraudulently obtained,

at least the issue as to whether or not they were so obtained was raised by the evidence, and therefore the court erred in instructing a verdict for the defendants.

What we have said in the discussion and disposition of contentions 1 and 2 disposes of the contentions last mentioned, in so far as they may be construed as an attack on the validity of the title acquired by Abrams, and those holding under him, to the lands described in the deed of Paul McCombs to W. H. Abrams of date March 1, 1906.

We shall therefore consider appellants' attack on the releases and quitclaim deed executed and delivered to Paul McCombs, of dates November 8 and 12, 1907, respectively as an attack only on the validity of the title acquired by Paul McCombs by such instruments, and that acquired by those holding under him by virtue of his deed to W. H. Abrams of March 23, 1914, by which he conveyed the 100 acres of land to W. H. Abrams. We overlooked this deed when we made our preliminary statement, so we now add a statement that on March 23, 1914, Paul McCombs, by his deed of that date, for a consideration of $500 cash, conveyed the 100 acres of land to W. H. Abrams. This 100 acres was thereafter leased, together with the land conveyed by McCombs to Abrams on March 1, 1906, to the Producers Oil Company, which was later transferred to and became and is now the property of the Texas Company.

For grounds of the attack on the leases and quitclaim deed mentioned, appellants alleged that Paul McCombs fraudulently concealed from them that there was any land situated in Brazoria county belonging to the estate of Florence McCombs, and falsely represented to them that the property situated in Dallas county, which he had sold under orders of the court, was all the property owned by said estate; that by reason of such concealment and false representations, they were induced to execute and deliver to Paul McCombs the releases and quitclaim deed, and that therefore such instruments were fraudulently obtained and had no effect to pass their interest in the land in Brazoria county, particularly the 100 acres mentioned, and that, since Paul McCombs got no title by virtue of such instruments, neither W. H. Abrams, to whom McCombs conveyed the 100 acres in 1914, nor those holding under him, got any title to the 100 acres.

There was, we think, sufficient evidence to raise the issue of the fraud alleged by appellants, and, if it is made to appear that a decision of such issue in favor of appellants would have affected the right of the parties, the court erred in taking that issue from the jury and instructing a verdict for appellees.

We have, however, reached the conclusion that, if it be conceded that the instruments attacked as having been fraudulently ob-

tained did not irrevocably pass title to the property conveyed thereby to Paul McCombs, nevertheless W. H. Abrams acquired title to the 100 acres by virtue of his deed from Paul McCombs of date March 23, 1914. As a purchaser in good faith, without notice or knowledge of the alleged fraud of McCombs, his title passed to those holding under him.

The quitclaim deed of Mora Atkinson and husband, and Melvorne McCombs, was duly filed for record July 31, 1908, in Brazoria county, Tex. There is no evidence whatever that W. H. Abrams at any time had any notice or knowledge that such quitclaim deed was procured by any fraud practiced by Paul McCombs on the grantees in said deed; therefore he had the right to rely upon the record title as it appeared in the proper deed records, and, having done so, and having purchased the land from the record owner thereof, and having received a deed thereto, he became a purchaser in good faith, and the defendants, his heirs, hold title through and under him, and certainly the Texas Company, who holds under W. H. Abrams, holds such interest in the land as was conveyed by Abrams to them or them through the Producers' Oil Company.

It is apparent from what we have said that we think that the undisputed evidence shows that the deeds of McCombs to W. H. Abrams of date February 16, 1901, and March 1, 1906, respectively, were executed in compliance with his contracts or agreements made by him with Abrams to convey the land to Abrams in the event he (McCombs) found himself unable to pay his part of the purchase money due the bank, and that they had the effect to convey to Abrams a valid legal title to all the land in controversy, except the 100 acres which, in compliance with the above-mentioned agreements, Abrams reconveyed to McCombs. We have also reached the conclusion that the 100-acre tract passed to Abrams by the deed from McCombs to him of date March 23, 1914, and that the court did not err in instructing a verdict for appellees for the land in controversy.

There still remains to be disposed of the contention of appellees that the instructed verdict for defendants was properly given, in that the undisputed evidence shows that appellees were entitled to a recovery under their pleas of limitation. While we are inclined to agree with such contention, we think it unnecessary to discuss the question, in view of our holding that the defendants hold their respective interests in the property by virtue of the deed from McCombs to W. H. Abrams.

For the reasons above expressed, the judgment is affirmed.

Affirmed.

GRAVES, J. (dissenting).

To empirically affirm the evidence to be undisputed on all the controlling issues in this controversy does not make it so, and upon examining the statement of facts, this member of the court has not found that to be its state, concluding rather that, under appropriate pleadings, it raised legally material issues of fact for the jury concerning at least these features:

(1) Whether the deed from Paul McCombs to W. H. Abrams of March 1, 1906, was in the exercise by McCombs of his power as community survivor to sell the lands it owned.

(2) Whether any interest in the lands described in that deed had constituted the separate property of the plaintiffs' mother, and, if so, how much.

(3) Whether the releases and quitclaim deed from the two of the three plaintiffs to Paul McCombs, exhibited November 12, 1907, in terms purporting to acknowledge the receipt of everything due them from, and to convey to, him all interest in both the community and the separate estate of their mother, had been fraudulently obtained.

(4) Whether the plaintiffs were barred by the statutes of limitation pleaded by the defendants from prosecuting any of their declared upon causes of action.

(5) Whether any of the defendants were such bona fide purchasers for value of the interests severally claimed by them in the lands involved as cut off all right or title of the plaintiffs therein.

Only an outline of the underlying reasons— springing from the evidence—for each point in its order will be undertaken; the basic pleadings for all being obviously sufficient.

(1) Admittedly by the defendants the community estate of Paul and Florence McCombs, up until that time, had owned some interest in the practically 1,750 acres this March 1 of 1906 instrument from Paul alone purported to so sell to Abrams "all my right, title and interest in"; she had died testate on July 19 of 1904 prior thereto, leaving their children, the plaintiffs herein, the share and share alike devisees of all her estate, hence half of such community interest—whatever it was—had already become vested in them by more than 1½ years; it could be divested out of them by their father in no other possible way than through the actual exercise by him of his limited power as the survivor of such community, that is, by such a sale of the whole estate to pay the debts or fulfill the obligations of the community as could be effective only in the event he acted in good faith toward them as the holders of this equitable title derived from their mother; if either legal or actual fraud inhered in the transaction, his potential power was destroyed, and no extinguishment of their title ensued. Eastham v. Sims, 11 Tex. Civ. App. 133, 32 S. W. 359; Sanger Bros. v. Heirs of Moody, 60 Tex. 96; Lipsitz v. Rice (Tex. Civ.

App.) 233 S. W. 594; Morse v. Nibbs (Tex. Civ. App.) 150 S. W. 766; Stone v. Jackson, 109 Tex. 385, 210 S. W. 953; Cage v. Tucker's Heirs, 25 Tex. Civ. App. 48, 60 S. W. 579, 581.

The precise question arises here, not upon the general power of the survivor to sell in payment of community debts, vel non, with which mainly, if not alone, the authorities cited by the majority have to do, but only upon whether or not a legitimate exercise of that undoubted power was shown in this instance as a matter of law; demonstrably, in my opinion, it was not; the burden was on the defendants, claiming under the deed from the husband alone, Paul McCombs, in view of the peremptory instruction in their favor, to conclusively prove the existence of the circumstances authorizing the sale (Eastham v. Sims, supra, Edwards v. Brown, 68 Tex. 329, 4 S. W. 380, and 5 S. W. 87); it seems clear they did not meet it.

Good faith in Paul McCombs as concerned his children's rights when he came to so deal with their equitable one-half interest in that large body of land did not mean, merely, "a bona fide intent to pay a community debt," as the defendants' briefs and arguments seem to me to define it, at whatever sacrifice of their interest, however avoidable such a sacrifice might have been, and in disregard of all disproportion between the value of the property and what he was to get for it. That is not, I think, the sense of the cited holdings of our courts; to me they reflect the wider view that his relationship toward them was a fiduciary one as the repository of a trust he was bound to administer for their best interest; in consequence, although at the same time he may have had a bona fide intention to pay a community debt out of the proceeds, he could not put their title beyond their reach, if—his grantee knowing or being charged with knowledge of such circumstances—he acted in total disregard of their interest, with no existing necessity for the sale, and in return for a consideration either grossly inadequate or personal to himself; the presence of such deterrent conditions would, per sese, constitute legal fraud and defeat the conveyance, whether or not there was wrongful intent. Lipsitz v. Rice, supra; Hand v. Errington (Tex. Com. App.) 242 S. W. 722.

If that be the rule, then, under the evidence received, it seems to me the jury were clearly entitled to find whether or not this sale was fair within itself for the purpose so permitted by law, and did instance a legitimate exercise of the surviving husband's power to sell.

Paul McCombs never qualified by law as community survivor, so at most he had only an equitable right to dispose of the community property, Speer's Law of Marital Rights in Texas (3d Ed.) paragraph 693, Davis v. McCartney, 64 Tex. 584; having so derived it, he was bound to do equity in the proper exercise of that right. The form of the transaction it evidenced, as well as the terms of the conveyance itself, were unusual for—if not reasonably suggestive of other purposes than—the resulting effect now claimed for them by the defendants; in addition, the outside attending circumstances shown and proffered for the consideration of the jury, which were indisputably either known or legally imputable to both parties, since Paul McCombs had from their inception been Mr. Abrams' man Friday in all the latter's dealings concerning these lands, plainly tended toward negativing the existence of Paul's right in equity to dispose of his children's interest.

The deed, a quitclaim in form if not indeed in character, does not specify the interest in the land the parties intended thereby to deal with; its recitations, which might as readily mean either that the entire community interest or only the grantor's one-half thereof was to pass, rather enigmatically ran: "In consideration of the conveyance to me of one hundred acres of land in the George Tennille survey, and the assumption by W. H. Abrams of the debt I owe to the Land Mortgage Bank of Texas for the purchase price of the land described herein, I hereby sell and convey to said W. H. Abrams of the County of Dallas and State of Texas, all my right, title and interest in all the land described."

Had his wife, Florence, the mother of plaintiffs, not then been dead, the contention that as a matter of law this deed conveyed the entire community interest might be sound, under the principle applied in the early case of Poe v. Brownrigg, 55 Tex. 133, where the wife was living, that the husband was presumably conveying the right, title, and interest, which by his own act alone he had the right to pass, that is, the whole community interest rather than his own one-half; that was true because our statute then, as well as ever since (present R. S. art. 4619), provided in substance: "During coverture the common property of the husband and wife may be disposed of by the husband only"; but when Paul McCombs on March 1 of 1906 came to thus deal with their common lands, the prior death of his wife, *which W. H. Abrams himself informed him of by telegram*, had changed all that; no such presumption therefore inured to the benefit of either himself or Abrams, and, not having qualified at law as community survivor, both he and his grantee with even imputable knowledge were dependent upon his doing equity toward those to whom it had passed before a disposition of his deceased wife's half of the community property could be effective between them; and so, especially with the deed in the ambiguous language it was couched in, extrinsic evidence of the at-

tending circumstances in order to determine what the parties meant by it, as well as whether or not it reflected a legitimate exercise of Paul McCombs' so qualified power to sell the community lands, was not only admissible, but made a jury question out of the whole inquiry. Jones v. Harris (Tex. Civ. App.) 139 S. W. 69; Iiams v. Mager (Tex. Civ. App.) 216 S. W. 422; Bell v. Wright, 94 Tex. 407, 60 S. W. 873; Right-of-way Oil Company v. Gladys City Oil, Gas & Mfg. Co., 106 Tex. 94, 157 S. W. 737, 51 L. R. A. (N. S.) 268.

The suggestion is respectfully ventured that the authorities cited and relied upon for a contrary conclusion do not, for the reasons indicated, so hold upon a legal equivalent of the state of facts here obtaining; that is, they were all based either upon conveyances, or at least agreements, made during coverture, or upon materially different attending circumstances.

Neither, in my opinion, is this controlling deduction in any wise answered by the argument that the facts here bring into play the recognized power of the community survivor to perform agreements made during the existence of the marriage, which, under such cases as Stramler v. Coe, 15 Tex. 211, is sought to be applied in support of the view that the deed in question from Paul McCombs passed the whole title in this land to Abrams; how this transaction can be metamorphosed into one of that sort is, confessedly, beyond my ken; to do so is in effect to assume as a matter of law, in the face of testimony of much probative force tending the other way, not only that the respective deeds dated February 16, 1901, from the bank to Paul McCombs conveying the 1,700 acres and from the latter to W. H. Abrams conveying to him an undivided one-half interest therein, were only executory as between them, and did not first vest the whole title to the land in McCombs and then in turn an undivided half thereof in Abrams, that Abrams was really in privity of contract with the bank as one of the purchasers from it of the land, that the March 25, 1901, letter from McCombs to Abrams, quoted in the majority opinion, did not reflect the real agreement between the two as to what interest in the land should then vest in each and on what terms, but also that the purported second letter, likewise so quoted, bearing date of February 16, 1901, had been a genuine and contemporaneous part of this original deed to Abrams for only a one-half interest, which admittedly had then been delivered by McCombs to Abrams and filed for record by him in Brazoria county on April 15th of 1901.

In the first place, the evidence repels any suggestion that the title to the whole 1,700 acres did not under the deed from the bank to him then vest in McCombs absolutely as the sole purchaser, subject only to his grantor's right to collect the unpaid purchase money, it undisputedly appearing from the testimony of Mr. Humble himself, who acted for the bank in the sale to McCombs, that it never knew Mr. Abrams in any relation to the transaction until January of 1906, when Mr. Humble was so advised by him in response to an inquiry. Abrams, by subrogation to such right in the bank from having paid its debt for McCombs, could in no event have acquired any greater right than it had—merely security for the debt. Humphreys-Mexia Co. v. Gammon, 113 Tex. 247, 254 S. W. 296, 29 A. L. R. 607.

Furthermore, defendant Paul McCombs positively testified that he and Mr. Abrams closed the trade and fixed the interests in the land between them pursuant to the terms of this letter of March 25, as follows: "Now on the 25th day of March, 1901, as I have testified, I had a talk with Mr. Abrams and he and I orally agreed on what deal would be made and he told me to go back to my office and write it up and I did, and submitted it to him and he approved it, yes sir. He gave me $800.00, yes sir. * * * It is true that Mr. Abrams and I agreed on it, and he sent me to my office and I wrote it up, and he approved the way I wrote it and gave me $800.00 under this letter of March 25."

It could not therefore have been merely a tentative offer, and not inconsistent with the second letter so quoted by this court.

In the second place, the question of the genuineness of this purported second letter bearing the date of February 16, 1901—irrespective of its directly contradictory nature to both the one of March 25th that McCombs so swore the several interests were fixed under and to the record title between them of an undivided one-half interest in each as it stood there unquestioned by any one from April 15, 1901, until January of 1921, when McCombs further swore he found this second letter in Abrams' office in Dallas—was clearly one for the jury under all the evidence; nobody vouched for this paper but defendant Paul McCombs himself; the doubtless inadvertent statement at the bar of this court, on oral argument by the able and high-class counsel for the Abrams defendants, Mr. Townsend, that he was present when this document was so "found," is dehors this record and entitled to no consideration whatever; he was not even a witness.

McCombs' testimony about it reveals, not only such inconsistencies between it and other records, papers, and practices in evidence as to make more than one choice between them reasonable, but also about four rationally irreconcilable, if not mutually contradictory, versions of just what the transaction about this land between Mr. Abrams and himself in fact was; this document, al-

though supported by him alone as vitally affecting the title to the land, was so drawn that it could not be recorded, not being acknowledged or witnessed; then, with the record by the acts and to the direct knowledge of both showing the two to have undivided half interests each, this paper which, if effective, gave Mr. Abrams a much greater interest, was intrusted by him to Paul McCombs, and by the latter placed among the former's papers, where he left it, without ever telling his children, the plaintiffs, that it existed, until he was hunting evidence on which to defend this suit against himself and Mr. Abrams in January of 1921; Mr. Abrams, he affirms, invariably kept letter-press copies of all important papers relating to the titles of his lands, and such copies of the deed of February 16, 1921, and its accompanying letter of March 25th, on which he elsewhere swore they had made the trade whereby he conveyed a. one-half interest in the land to Abrams, were preserved and are in this record, but there was no such copy of this paper.

His four accounts were: (1) That he and Abrams orally agreed that Abrams would advance him money for his part of the cash payments on a one-half interest in the land, and pay it back out of the salary Abrams was paying him, he to thus repay Abrams *as and when he could*. (2) That the quoted letter of March 25, 1901, under which the title to the land was procured from the bank, evidenced their agreement, the arrangement for repayment of advances by Abrams for McCombs' half being expressed in the letter (though not in the oral agreement) only as to the first $800 payment, and that advancement to be repaid at·the rate of $100 per month. (3) That the herein called second letter, which bore the date of February 16, 1901, but which he at first testified had been actually written on or about March 27th, or two days after the one on which the deal had been so closed, was in fact their controlling understanding;· it contradicted both the preceding ones, in that under them the title was vested equally in Mr. Abrams and himself, whereas under this the equitable title to the whole of the land was to both vest at that time and remain in Abrams, except to the extent that McCombs should pay and only if and when he paid, or to quote his exact testimony on the point: "It is true that the two deeds, Humble's company to me and mine to Abrams and these two letters, Exhibit No. 108 and Exhibit 110, dated the twenty-fifth of March, 1901, and the sixteenth of February, 1901, constitute the whole transaction. I was to take the property in my name. He was to pay it, and I was to return as much as I could, and then he was to deed me whatever part of the land I paid for. I was merely trustee, holding that in my name for his benefit." (4) On having this contradiction called to his attention, he finally swore that the two letters and the two deeds he had just stated comprised the deal did not do so, but that only the last-mentioned letter and the two deeds did.

This letter, which he thus at last hangs the whole case for himself and the Abrams defendants on, is likewise incompatible with his two "histories" of this transaction of 1903 and 1904, respectively, that are in evidence; each of these purported to be a complete history of the transaction to its date, both not only failed to mention any different or additional agreement, but also expressly contradicted this alleged second letter of February 16, 1901, by reciting that Abrams had bought from and held under McCombs a one-half interest in the land.

While what has thus been outlined indicates only part of the testimony, it is deemed sufficient support for the position taken.

In this connection no stop is made to consider the intrinsic effect of this letter of February 16th, if genuine, since it is only here maintained that the jury should have been permitted to pass on whether it was so or not; however, its terms did not purport to authorize a partition, and, if they had, there was evidence tending to show the McCombs' interest to then comprise more than 200 undivided acres, instead of an unincumbered 100 acres, segregated out of the least valuable of the 1,750 acres.

Since, under these considerations, the peremptory instruction was not justified on the theory of a post mortem execution by her surviving husband of an agreement touching their common property made while Mrs. McCombs was living, recurrence is had to the particularization of just a few of the beforementioned attending circumstances that made a fact issue out of whether or not he was otherwise exercising such a survivor's power in then making the March 1, 1906, deed to Abrams.

The method pursued was at least calculated to mislead; instead of conveying to Abrams the whole of the land less a specifically described 100 acres, it merely and nebulously recited "in consideration of the conveyance to me of one hundred acres of land in the George Tennille Survey in Brazoria County, Texas, by deed of even date herewith," describing therein no land at all, so that specific performance of a contract to convey it could have been enforced, nor was any such conveyance then or thereafter ever produced or recorded in the deed records of Brazoria county, only a letterpress copy thereof from the files in Mr. Abrams' office being offered in evidence on this trial; putting the record of their transaction in this condition, and so leaving it until this trial in 1928, whatever their intent or objective, left nobody else in position to know what had been done, and destroyed any possibility of a continuing presumption that any defined 100 acres could be

the proceeds of the sale of the whole community interest; in addition, as the majority of this court properly find, there was sufficient evidence to raise the issue of actual and fraudulent concealment from his children by Paul McCombs that there was any land in Brazoria county belonging to their mother; the witness J. D. Crutcher of Dallas, uncle of the McCombs children and their attorney in their controversy with their father over their mother's estate in 1905-1907, testified to this conversation about the matter at that time with Paul McCombs:

"I said: 'Where is Florence's interest in this Silliman land you were going to get so rich on?' and he said: 'Well, we lost that under foreclosure proceedings.' I said: 'That is about what we talked about you would do.'

"After I had this conversation with Paul about the whole estate—what the property consisted of, I went over to see Colonel Abrams and asked him about this Brazoria County land. I wanted to confirm and see whether or not there was anything to it. I was objecting in the case, objecting to certain property there being listed as community and I wanted if I could to ascertain which was community and what was separate and what Colonel Abrams would tell me. I asked him about this property and he told me they had lost it. I said: 'Well, how did you lose it?' He said: 'Well, it was taken by foreclosure.' He said: 'Paul knows all about the details of it. I don't know. I didn't keep up with it.' And he said that the payments were kept up for a while but that the property didn't turn out like Paul thought it would, and for me to get all the information out of Paul—that he would give it to me."

There was too ample testimony, much of it from two land value experts in that locality, the witnesses, John Underwood, grandson of the original owner of this land, and Judge Bartlett, justice of the peace, that on March 1, 1906, the value for agricultural purposes only of this entire 1,700 acres was an average of $20 per acre, while the like value of the purported 100 acres in its northwest corner that McCombs said he got as part consideration for his deed for the balance to Abrams, and on March 23d of 1914 essayed to convey back to him, was only $10 per acre; that oil prospects were then limited to the area around the southeast corner of the land as a whole, where the market value for oil of small tracts has enhanced, sales of neighboring lands having been made for $30, $50, and $300 per acre; that both Paul McCombs and Mr. Abrams were advised of these conditions is at least reasonably inferable from many other circumstances in evidence, both having visited the land, having participated in the Tennille suit settlement in 1904 when Tennille's attorneys selected the 100 acres for him out of the southeast corner, Mr. Abrams having had a report as to the "expected oil fields," and both having leased the lands for surface uses and taken care therein on Mr. Abrams' insistence to reserve all mineral rights; in a word, the testimony referred to was sufficient to support a finding that the equity of the McCombs' community half interest in the land, after the purchase price, taxes, and all advances made by him had been refunded to Mr. Abrams, and not counting at all the additional oil values so given, was then of the value of $13,755, whereas that of the 100 acres claimed to have been received for it was only $1,000, and this was still subject to its proportionate part of the assumed debt, along with taxes—plainly such an inequitable consideration as raised an issue concerning the good faith of the parties to the transaction.

The jury were further entitled to determine from evidence clearly sufficient to raise those issues, whether this sale of 1906 was made for the benefit of the community, in exercise of the measure of discretion vested by law in the survivor in such circumstances, and under the compulsion of necessity, or in abrogation of McCombs' fiduciary relation toward his children's interest in that community, without any reasonable necessity because no debts against it were pressing, and for a consideration so inadequate and inconsequential as to amount to frittering away their birthright for a mess of pottage in response to some personal consideration to himself, or other improper motive; when his surroundings at that time are taken into consideration along with it, Paul McCombs' own testimony goes far toward making a jury question out of the whole matter; he had married again and become the head of a new community in January of 1905, he had already ordered his son Melvorne "to get out and stay out" of his home, had filed application in the probate court of Dallas county to be appointed administrator, with will giving her estate exclusively to her children annexed, of his deceased wife's estate, reciting only that she had left two houses and lots in the city of Dallas, the smaller being her separate estate, and the larger the community of herself and petitioner; as above indicated, the net value over and above the incumbrance of half the land was at least $13,755, and, according to several witnesses, there had been for several years practically continuous operations for oil in the neighborhood—oil having already been produced on the nearby Arnold tract—with such resulting enhancement in values that sales in small tracts in the immediate area of the southeast corner of this land had been made at $30, $50, and $300 per acre, all of which facts, by fair inference at least, it is reasonable to conclude were then well known to Paul McCombs; the unpaid purchase-money debt to the bank then amounted all told to only $6,500, and it is undisputed, not only that Mr. Humble for the bank was not pressing for its full payment, being willing to carry it along indefinitely on the liquidation

of interest and other small payments, but that Mr. Abrams was both able and willing to meet all those payments as so required and to carry the McCombs' community for its portion thereof for Paul McCombs without any different arrangement than had before been existing between them; yet, although he had previously been down to see the land three or four times every year up to 1906, admittedly he neither visited it during that year before executing this deed to it on March 1, nor talked with Mr. Humble about it, nor made any inquiries about nor efforts to sell any part of it, but instead went to Dallas "and threw up my hands to Mr. Abrams, and said I was through and wanted to quit," further saying:

"At the time of this exchange of deeds, at the time that I had that deed in my hands, I expected to come down here in two or three days. And I was throwing up my hands and saying: 'I don't want to investigate the land; I don't want to see what I can do with it; I am through,' yes sir, that's it. Mr. Abrams didn't ask me to do that. It was on my own initiative, absolutely. He would have carried me just as far as I wanted him to, yes, sir. On my own insistence, two or three days before my planned trip down here, I insisted on giving up my rights here, yes, sir, that's right. I didn't take it up with my children at all; didn't think I had any business to take it up with them. In answer to your question 'Why the hurry about closing the deal with Mr. Abrams? Why do it on the 1st of March when you could wait and come down here and see what you could do with that equity of five thousand dollars, or more, that you have testified you had in that land?' the 1st of March didn't apply to it; I wanted to get rid of it and I did; it was a very deliberate process on my part; I didn't believe I could pay for it, and I didn't want to continue to try to. The proposition didn't appeal to me and I wanted to get rid of it, yes sir."

In my opinion, he could not have done in the prevailing circumstances what he thus confesses he did do, and yet he held *as a matter of law* to have been in good faith in so deeding away the whole community interest in 1,700 acres of land.

(2) Approach is made to this question in much respect to what our courts have held to be the requirements for engrafting a parol trust upon the legal title to land; as apropos to the state of the case here involved that seems to me to be well reflected in these cases: Blumenthal v. Nussbaum (Tex. Civ. App.) 195 S. W. 275; Johnson v. Bingham (Tex. Civ. App.) 251 S. W. 529; Briscoe v. Bright's Administrator (Tex. Com. App.) 231 S. W. 1082, 1084; Carl v. Settegast (Tex. Com. App.) 237 S. W. 238; Howard v. Zimpelman (Tex. Sup.) 14 S. W. 59.

The rule as to the quantum of proof is, in consonance with the other holdings cited,

thus aptly and with express approval of our Supreme Court epitomized by the Commission of Appeals in the Briscoe Case: "It only requires that the terms of the contract essential to recovery be supported by evidence sufficiently clear for the court to determine what those terms were without resorting to inference or conjecture."

In no event, of course, did their father as community survivor have any power to divest—by the deed from himself—these plaintiffs of an interest in the land that had been the separate property of their mother—that, in preface, is laid down as a legal axiom.

When tested by the quoted rule, the evidence here seems to me to have plainly raised the issue as to the claimed existence of a parol trust; the testimony of the witnesses, C. F. and J. D. Crutcher alone—corroborating each other, and in turn being corroborated in material particulars both by instruments of record and other witnesses—clearly and satisfactorily reflects the existence of an explicit and completed trust, agreed to by Paul McCombs, and both known to and acknowledged as having been in fact established by W. H. Abrams. These two men, brothers themselves, and both brothers-in-law of Paul McCombs, each having married a sister of his wife, were the uncles of his children and in intimate family and business association with him during all the time here material; the one, J. D., was a lawyer, who had represented the McCombs children in the controversy with their father over their mother's estate in 1905–1908, as to the releases and quitclaim deed in which this court has found an issue of intentional fraud on his part toward his children was raised, the other was a real estate man at Dallas, in whose home Mrs. Florence McCombs had died after an illness there of three weeks; both men then knew Mr. Abrams also; in material substance they testified:

(1) Mr. C. F. Crutcher:

That in 1904, Mrs. McCombs had owned separate property in Dallas that had come from members of her father's family worth $40,000, incumbered for about $4,000; that in 1901 he had a conversation with Paul McCombs about the purchase of about 1,700 acres of land in Brazoria county; that Paul said he intended to buy a half interest for his wife, Florence, and that her brother, Nat P. Jackson, had given her $400 with which to pay the cash payment; that he himself had done $1,000 worth of surveying work on the land, which he would let go in also; that he had a subsequent conversation with Paul —he thought it was in January of 1901—at which time Paul told him that he had taken this $400 cash payment which his wife had so given him, and had given the $400 to W. H. Abrams, and that Abrams would pay the $800 for the cash payment in check to the

owners of the land for the two interests—the interest of Mrs. McCombs and the interest of Mr. Abrams; that about two weeks before her death, that is, about July 4 of 1904, he heard a conversation in his home between Florence and Paul McCombs at which Paul told his wife he would either have to borrow money on or sell some of their lands about Rockport or in Brazoria county, and to which she replied by directing him not to sell, or use the Brazoria county lands to raise the money, saying she would not sign a deed—"that she didn't want to sacrifice her Brazoria County oil land"; further, that the witness had a conversation with W. H. Abrams with reference to the land after the purchase of the land; that this conversation was in the witness' office, Col. Abrams coming to the office to look out of the window to watch a parade. That before Col. Abrams left he asked the witness whether he had seen Paul McCombs and where he was, and where Florence McCombs was, and added "that he (Colonel Abrams) and Florence McCombs owned some lands together down in Brazoria County; some oil lands he called them at that time." That he had some information about oil prospects and wanted to see Mrs. McCombs and tell her what he thought about the land.

(2) Mr. J. D. Crutcher:

The first conversation in February, 1901, was that Paul McCombs told him he wanted Charley Crutcher to have his wife join Paul's wife in the purchase of a big tract of land in Brazoria county, about 1,700 acres, called the Silliman tract, worth $10 or $12 an acre, which could be obtained for about $4 subject to a mortgage. That McCombs stated he had discussed the matter with Charley Crutcher; stated that Nat P. Jackson had given Florence McCombs $400, and that it would only take $800 to swing the transaction; that, if Charley's wife did not purchase a half interest he would sell that half interest to Abrams, and that Abrams would then own it jointly with his wife, Florence.

That a short time later the witness had another conversation with Paul McCombs, in which McCombs referred to the matter; that McCombs said that Clara, Mrs. Charles Crutcher, did not want it, and that Abrams had taken the other half interest along with his wife, and that Abrams and his wife, Mrs. McCombs, owned the land; that this was shortly afterward, some time in March, 1901.

That subsequently the witness had a conversation with W. H. Abrams; the witness happened to be in the office of Capt. Beckwith, or the office of Mr. Abrams, and saw Mr. Abrams and told him: "Paul informs me that you and Florence have bought some land in Brazoria County." To which Abrams replied: "Yes." That he then told Abrams to watch out for the deferred payments, which

the witness laughingly referred to as "echoes." That subsequently the witness had another conversation with Mr. Abrams about the land; that this was about 1907, and was in regard to the administration that Paul McCombs was having on the estate of Mrs. Florence McCombs and about the sale of the Main street property. This third and last conversation with Mr. Abrams here referred to has been hereinbefore detailed, beginning on page 9 hereof.

Paul McCombs denied all these witnesses said, except as to numerous details it is deemed unnecessary to refer to.

This testimony, if true, traced the specific sum of $400 of Florence McComb's separate funds into this land for the expressly agreed upon purpose of constituting it pro tanto her separate property, which vested interest was thereafter recognized, acquiesced in, and acknowledged as existing by both Paul McCombs and W. H. Abrams, thereby comprehending all the essential elements of a trust and leaving nothing to inference or conjecture.

That it was admissible against Paul McCombs himself, a defendant here, and all those asserting a claim of title from him under his deed to W. H. Abrams of March 1, 1906, and thereby claiming to be in privity with him as embodying declarations against interest, seems to me not debatable. Whether the defendants, or any of them, were entitled to the instructed verdict awarded, because of limitation or bona fide purchase, is an entirely different and immaterial consideration on this question; they all do, in fact, claim under that deed, hence cannot on account of its alleged hearsay character exclude the testimony tending to establish the parol trust against their grantors. Wigmore on Evidence (2d Ed.) § 1082.

(3) In view of the majority finding that the evidence raised the issue as to the fraud alleged concerning the quitclaim deed and releases executed by two of the McCombs children, which has my concurrence, it becomes unnecessary to elaborate upon that question; to waive that issue aside, though raised, however, as being immaterial to any right of any party to the suit, is not agreed to; obviously, if issues (1) and (2), supra, were also raised, no such discarding could occur, for the reason that, should the jury find in response to those two that the plaintiffs had an interest in the land—whether emanating from their mother's community or separate estate—that did not pass to Abrams under the 1906 deed, the grantors in the releases and quitclaim would further be entitled to a finding on whether or not it was divested out of them by those instruments; in that event, too, it being so found that the 1906 deed had failed to convey to Abrams the plaintiffs' interest in the land, it would follow that his alleged

contemporaneous effort as a part of the same transaction to convey back to Paul McCombs 100 acres that, by a claimed presumption, became property of the McCombs community, was equally ineffective as concerned plaintiffs, because he had acquired nothing of theirs to reconvey; for the same reason it would also result that, as to the plaintiffs, no sale of any such 100 acres from Paul McCombs back to Abrams on March 23 of 1914, whether Abrams innocently undertook to then so purchase for value or not, could have had any effect.· The main dependence of the defendants against the fraud issue thus found to have been raised for the jury, however, seems to be that the trial decree of the probate court of Dallas county settled all claims of plaintiffs against their mother's estate, community and separate, and cannot by this suit be attacked collaterally.

As complete answers to this contention, it is suggested, first, it conclusively appears from the records therein, that the 1,700 acres here in question was neither inventoried nor a part of the properties with which either that court or the guardianship court of El Paso county in the matter of Helen (McCombs) Overton's estate actually dealt; the several orders of those courts discharging Paul McCombs as administrator of his deceased wife's estate and Peyton Edwards as Helen's guardian, respectively, as having distributed to the plaintiffs all they were entitled to both from their mother's community and separate estates, having in fact to do exclusively with other properties, could not affect the title to those different ones sued for herein, Griffith v. Godey, 113 U. S. 89, 5 S. Ct. 383, 28 L. Ed. 934; Thomas v. Hawpe, 35 Tex. Civ. App. 311, 80 S. W. 129; second, if it could be said that any part of this land was involved in those proceedings, however, on account of the hazy reference to Paul McCombs' inventory as such administrator to "100 acres of the George Tennille Survey in Brazoria County, community property, valued at $400.00," then beyond a doubt the evidence raised the issue as to—if it did not compel the finding of—such fraud by Paul McCombs on both the parties in those different proceedings and the courts that entered the relied upon decrees therein as rendered them wholly void, in that he misled them all into believing and acting upon his statement that neither the McCombs community nor Florence McCombs' separate estate then owned any land of any value whatever in Brazoria county; under those representations to the plaintiffs here and their attorneys, as well as to the courts themselves, he both procured the releases and quitclaim deed now under review as constituting full payment for everything due the children from both estates of their mother, without in fact, paying them anything on account of this

Brazoria county land, and the entry of the two decrees so adjudging.

In no event, it seems to me, can an affirmance be had as to Paul McCombs; though a defendant—the only one who personally participated in the challenged transaction with Abrams—he yet has no defender; he stands briefless and unanswering in this court, although charged, on evidence sufficient to raise issues of fact about it, with fraud against his children in having—through concealment Mr. Abrams must be held to have known of—withheld from, as well as acquired after, the 1906 transaction personal interests for himself in this land that at least belonged to the community estate of himself and their mother; and below was awarded judgments against them for interests in two tracts of this land—one-third interests each in 50-acre tract G and 30-acre tract C; he himself had first conveyed all the large tract inclusive of these small ones to W. H. Abrams, and later received conveyances to them back from Abrams; while under the evidence it would seem to me an invasion of the jury's province to hold Abrams as a matter of law to have been an innocent purchaser of these smaller tracts, still McCombs would hold the fruits of his own individual fraud against them, if it were found to have existed, in trust for his children unprotected by Abrams' good faith, under this exception to the general rule by which a purchaser with notice is protected to the same extent as his vendor, if the vendor in turn was a purchaser without notice.

"The rule, however, is subject to qualification. Thus it is held that though a bona fide purchaser of land has taken it free from unknown equities, still if the prior grantor in whose hands the land was charged with equity and through whose conveyance to a bona fide purchaser it was discharged, reacquires title from or under such bona fide purchaser, the equity will reattach to the land in his hands. And on a resale of the land by such grantor, his grantee will take subject to the reattached equities, unless he himself occupies the position of a bona fide purchaser." 27 Ruling Case Law, p. 685, and footnote citations.

(4) Since, apparently, neither the trial court nor this court has held the plaintiffs barred in any respect by the interposed statutes of limitation, extended presentment here of the affirmative view that they were not shown to have so been as a matter of law, at any rate, would seem not to be called for; the fully proven several disabilities of minority, coverture, and the lack of any definite knowledge until about October of 1920 of even the existence of this tract of Brazoria county land as having belonged to both or either of their parents, as well as of its having been involved in the deeds of 1906 and

1907, which they charged had both been fraudulent as to them, continuously tolled all the adversely pleaded limitation statutes as to them from the death of their mother in 1904 until 4 years after they discovered, or in the exercise of due care should have discovered, the existence of such alleged fraud, if in fact it ever occurred, R. S. arts. 5518 and 3996, Dean v. Dean (Tex. Civ. App.) 214 S. W. 505; 17 Ruling Case Law, 859; Hand v. Errington (Tex. Civ. App.) 233 S. W. 567; Rutherford v. Carr, 99 Tex. 101, 87 S. W. 815; Burnham v. Hardy Oil Co., 108 Tex. 555, 195 S. W. 1139; Humphreys-Mexia Co. v. Gammon, 113 Tex. 247, 254 S. W. 296, 29 A. L. R. 607; that the evidence did at least raise the issue as to the existence of the fraud has already been pointed out, and plaintiffs filed this suit to recover the land in December of 1920, and to cancel these two deeds on account of the fraud in October of 1922, further averring in 1927, on allegedly newly discovered evidence, that an undivided interest in the land had been their mother's separate property.

So that, under the authorities cited and the evidence, the jury should have been permitted to find (1) whether the fraud was committed, and (2) whether the plaintiffs were in the exercise of reasonable diligence in not having discovered it before they did about October, 1920.

Other than as to these two issues of fact under the 4-year statute, which alone ruled the counts for cancellation for fraud (Thomason v. McIntyre, 113 Tex. 220, 254 S. W. 315), I think the facts indisputably developed conclusively negatived the applicability of either the 5, 10, or 2-year statutes, that is: (1) the plaintiffs were shown to be cotenants with their father and W. H. Abrams prior to March 1, 1906, and no adverse possession against them for the severally required periods of which notice was given or brought home to them occurred, under these authorities: McCoy v. Long (Tex. Com. App.) 15 S. W.(2d) 234; Chance v. Fortenberry (Tex. Civ. App.) 247 S. W. 890; Arrington v. McDaniel (Tex. Civ. App.) 4 S.W.(2d) 262; White v. McGregor, 92 Tex. 556, 50 S. W. 564, 71 Am. St. Rep. 875; Clements v. Texas Co. (Tex. Civ. App.) 273 S. W. 993. (2) No oil was removed from the premises by the defendants until July of 1920, wherefore the 2-year statute (R. S. art. 5526) could not have barred the action for conversion of it, begun in December of the same year.

(5) The Abrams defendants acquired all their interest in both the land and its proceeds under two deeds from W. H. Abrams of date July 29, 1920, and August 5, 1925, respectively, the consideration for the first being love and affection and $10, that for the second being a trusteeship, hence none of them through such instruments became, independently, such bona fide *purchasers* for value as to cut off any equities the plaintiffs might have had; in other words, they still stand in the shoes W. H. Abrams himself would now be wearing, had he retained the property.

The defendant Texas Company, in its turn, seems to me to occupy no better position than would its mediate predecessor, the Producers' Oil Company, which the former's immediate predecessor of the same name as its own but of different domicile absorbed or reassimilated for a consideration paid "in cash or credit" as a mere subsidiary, would have been in, had it not transferred the lease; in such circumstances, it cannot be said as a matter of law that the present company was not chargeable with notice of the same facts the Producers' Company knew or should have known.

So the question whether either they or it are to be protected as innocent purchasers is determinable upon whether or not W. H. Abrams and the Producers' Company, respectively, would have so been.

On considerations already indicated herein for a different application, I do not see how either set of them can be held to be such as a matter of law; for instance, the previously quoted granting clause of the March 1, 1906, deed, under which all derived their claimed interests, apparently only purports to pass the title of the grantor, rather than the land itself, while elsewhere reciting an assumption of the purchase price debt against it, hence raises such an ambiguity as required recourse to the attending circumstances to determine which was meant, Cook v. Smith, 107 Tex. 119, 174 S. W. 1094, 3 A. L. R. 940; Harrison v. Boring, 44 Tex. 255; Houston, etc., v. Niles (Tex. Com. App.) 255 S. W. 604; Benton Land Co. v. Jopling (Tex. Com. App.) 300 S. W. 28; neither does the use of the word "premises" in the also quoted habendum clause clarify the uncertainty any, since it does not indicate that anything other than a quitclaim was intended. Threadgill v. Bickerstaff, 87 Tex. 520, 29 S. W. 757.

Under the recent approval of the Supreme Court of the opinion of the Commission of Appeals in Deaton v. Rush, 113 Tex. 176, 252 S. W. 1025, there is also serious doubt as to whether the 1914 lease to the Producers' Company from Abrams, under which all the oil has been produced, was such an instrument as the grantee could become an innocent purchaser under, since there was unquestionably none other than a merely nominal consideration at the time of its execution, when the then severed mineral estate became vested in the lessee.

It may be that findings on the herein suggested intervening fact issue would determine the corporate defendant to be such an innocent holder of all the rights conferred by the lease, at least until it was served with cita-

tion in this suit on January 7, 1921, but even that would not wholly dispose of the plaintiffs' claims, because, by the express terms of the lease, its interest was seven-eighths only of the minerals, one-eighth thereof being reserved to the grantor to be paid in kind at the well or in pipe lines, which net one-eighth would still remain subject to such claims as between the plaintiffs and the Abrams defendants. Waggoner Estate v. Wichita County .(C. C. A.) 3 F.(2d) 962.

It goes without saying that Paul McCombs was not and could not be protected by the law of innocent purchaser; as to the Abrams defendants, the whole question, in my already indicated view, depends upon whether or not there existed such infirmities in Paul McCombs' various dealings with and conveyances to W. H. Abrams—whether from lack of power or because of fraud—as prevented his thereby acquiring all the plaintiffs' interest in this land, of which he then either knew or should have known, and that, under all the facts and circumstances in evidence, these inquiries were exclusively for the jury.

Under the accepted rule that the evidence must be considered most favorably toward the plaintiffs, discarding all that tends otherwise, and all conflicts, however strong, I cannot hold this cause to have been one for disposition by peremptory instruction; this dissent from an affirmance of such a judgment is earnestly entered.

### Additional Opinion.

PLEASANTS, C. J.

As shown in the opinion of Justice LANE, I concur in the conclusion expressed in that opinion that the judgment of the trial court should be affirmed. The purpose of this opinion is to point out the insufficiency of the evidence to raise any issue of fact material in the determination of this appeal, and to add some additional compelling reasons for the affirmance.

I do not think the evidence raises any issue as to the genuineness of the letter of February 16, 1900, which McCombs testified he wrote and delivered to Abrams as a part of the contractual terms upon which a one-half interest in the land was originally conveyed to Abrams. It is not in terms contradictory of the letter of March 25th, set out in the opinion of Justice LANE. It merely adds an additional agreement, which, while it affects the character of McCombs' title to the one-half interest in the land retained by him, also permits McCombs to relieve himself of his obligations to Abrams to pay one-half of the unpaid purchase money due the Land Mortgage Bank and get title from Abrams to such proportion of the land as he may have paid for, which McCombs could not have so acquired in the absence of this agreement. Abrams' acceptance of this additional agree-

ment bound him thereby and gave to McCombs a right which in his pecuniary situation might become, and which under all the evidence in the case did become, of material value, in that it enabled him when he was no longer willing to carry out his contract with the Land Mortgage Bank to acquire 100 acres of the land that he might otherwise have lost.

It is true that at one stage of his testimony McCombs stated that the original trade with Abrams was on the basis of his letter of March 25th, and subsequently states that the two letters composed the terms of the original agreement. This seeming inaccuracy in his first statement, which he subsequently corrected, is not sufficient to raise an issue as to the genuineness of the letter of February 16th. He testified that this letter was a part of the contract by which he conveyed Abrams his original one-half of the land, and that he found it among Abrams' papers some time before it was introduced in evidence. His cross-examination upon these statements brought out nothing tending to discredit them beyond the claimed contradictions before mentioned.

It is not contended that the instrument bears on its face any evidence of forgery, and no fact is shown tending in the least to contradict the statement that it was found with Abrams' papers after his death. Nor can I find in this record any sufficient evidence to raise an issue of fraud or bad faith in the sale to Abrams after the death of his wife of the community interest in the land. Fraud or bad faith on the part of McCombs cannot be inferred from the circumstances that Abrams was not pressing him for repayment of the advances made for him, and that, if McCombs had held on a year or two longer, the fortuitous discovery and production of oil on a portion of the land would have made his interest in the land of great value. McCombs cannot be branded as a fraud or forger because he was unwilling to longer assume obligations he felt unable to meet and was unwilling to continue on the chance of oil being discovered on the land. He is far from being the first or the only man in such situation whose heart became sick from "hope deferred" and who unnecessarily surrendered when, if he had carried on a little longer, he would have received the full fruition of his hopes.

When the whole record and all of the testimony of McCombs is considered, the most that can be said of his statements in regard to his dealings with Abrams is that he may have been at times somewhat "leaky of tongue and pen." With high respect for the contrary opinion of Justice GRAVES, I do not think there is any evidence in this record of sufficient probative force to raise more than a surmise or suspicion of fraud in McCombs' transactions with Abrams, and, under the well-settled rule of decision in this state, such evidence does not present an issue for the

jury. Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059.

I am further of opinion that the statutes of limitation pleaded by appellees and fully sustained by the evidence constitute a perfect defense against the suit of the appellants, as heirs of the community estate of their mother in the land. The record shows that the deed from McCombs to Abrams made in March, 1906, was recorded in Brazoria county March 5, 1906. Tax receipts were exhibited showing payment by Abrams for each year from 1907 to 1920, inclusive. The undisputed testimony shows that during all those years the land in controversy was in the possession of R. R. Farmer under a lease with Abrams; that he used it for pasture; that he kept the fences in constant repair, riding them regularly; that the possession was open, exclusive, and adverse.

This evidence fully supports appellees' pleas of 5 and 10 years' limitation.

The subsequent lease of the land to the Producers' and Texas Oil Companies in no way affected the adverse and exclusive character of the possession. Clements v. Texas Company (Tex. Civ. App.) 273 S. W. 993; Gathright Land Co. v. Begley, 200 Ky. 808, 255 S. W. 837.

The contention of appellants in reply to the plea of limitation is that they were cotenants with McCombs, and no notice was given them of the repudiation of such cotenancy.

The deed from McCombs to Abrams can only be construed as conveyance of all of the one-half interest in the land then held by him under his deed from the Land Mortgage Bank, less the 100 acres conveyed to him by Abrams. That a deed of this character by one cotenant is sufficient to put the other cotenant upon notice that his rights in the property conveyed have been repudiated appears to be settled by the following cases: Church v. Waggoner, 78 Tex. 200, 14 S. W. 581; Humphreys v. Edwards, 89 Tex. 518, 36 S. W. 333, 434; Puckett v. McDaniel, 8 Tex. Civ. App. 630, 28 S. W. 360.

I also agree with appellees that the defense of innocent purchaser interposed by the Texas Company was sustained by the uncontradicted evidence. The record shows that on December 23, 1914, Abrams executed a mineral lease or deed conveying the minerals in and under the land to the Producers' Oil Company, the predecessor in title of the Texas Company. This lease recites a consideration of $5, and that the instrument is executed for the purpose of having the oil prospects of the land developed, and expressly conveys to the grantee "all the oil, gas and sulphur in and under the land." The lease further provides:

"If operations for the drilling of an oil or gas well are not begun on said land on or before the first day of April, 1915, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor, or to the credit of the lessor * * * the sum of $500, which payment or tender may be made by the check or draft of the lessee, and however made, shall operate to confer on the lessee the privilege of deferring the time limit for six months from said date. Thereafter in like manner and upon like payments or tenders of said amount, the time limit may be further deferred for additional periods of six months successively * * * for a period of five years.

"If during the period of this lease or during the extension of the time limit for drilling there shall be drilled on adjacent land and within 200 feet of any line of said leased land, a well producing as much as 50 barrels of oil per day for thirty consecutive days, the lessee will, with reasonable diligence, begin and prosecute the drilling of a well on said leased land in a faithful effort to find and produce oil in paying quantities."

If oil was discovered, the lease was to remain in effect as long as oil should be produced therefrom in paying quantities. The lease was made assignable.

On November 13, 1917, two deeds were executed by Producers' Oil Company to the Texas Company, both including this lease. One of them recites a consideration of $3,000,000 and includes various other properties.

The consideration recited in this deed was paid by the Texas Company. Prior to this sale the Producers' Oil Company had made the semiannual payment of $500 each in accordance with the provisions of its lease from Abrams, and thereafter the Texas Company made these payments until it began drilling for oil on the land, the total amount so paid being $5,000.

Neither the Texas Company nor the Producers' Company had any notice, at the time this lease was acquired and these payments under the lease were made, that McCombs had ever been married, and knew nothing of the claims of appellants, or of appellants' existence.

It is, I think, clear that the consideration for this lease and conveyance was amply sufficient to support appellees' plea of innocent purchaser. This conclusion is fully sustained by the following cases: Texas Company v. Barker (Tex. Civ. App.) 258 S. W. 864; Burt v. Deorsam (Tex. Civ. App.) 227 S. W. 354, 355; McKay v. Lucas (Tex. Civ. App.) 220 S. W. 172.

As I understand this record and interpret the decisions of our higher courts, the trial court was required to grant appellees' motion for an instructed verdict.